2019 IL App (2d) 180230
Nos. 2-18-0230, 2-18-0231, 2-18-0245 cons.
Opinion filed March 20, 2019

_____

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

_____

| | | |
|---|---|---|
| THE UNITED CITY OF YORKVILLE, | ) ) | Appeal from the Circuit Court of Kendall County. |
| Plaintiff-Appellant, | ) ) | |
| v. | ) ) | No. 11-L-30 |
| FIDELITY AND DEPOSIT COMPANY OF MARYLAND; KIMBALL HILL, INC.; TRG VENTURE TWO, LLC; and WILLIAM RYAN HOMES, INC., | ) ) ) ) ) | |
| Defendants | ) ) | |
| (Fidelity and Deposit Company of Maryland, Defendant and Third-Party Plaintiff-Appellant; TRG Venture Two, LLC, and William Ryan Homes, Inc., Defendants and Third-Party Defendants-Appellees). | ) ) ) ) ) ) | Honorable Stephen L. Krentz and Robert P. Pilmer, Judges, Presiding. |

_____

| | | |
|---|---|---|
| THE UNITED CITY OF YORKVILLE, | ) ) | Appeal from the Circuit Court of Kendall County. |
| Plaintiff-Appellant, | ) ) | |
| v. | ) ) | No. 14-MR-90 |
| FIDELITY AND DEPOSIT COMPANY OF MARYLAND; KIMBALL HILL, INC.; and TRG VENTURE TWO, LLC, | ) ) ) ) | |
| Defendants | ) ) | |
| (Fidelity and Deposit Company of Maryland, Defendant and Third-Party Plaintiff; | ) ) | Honorable |

TRG Venture Two, LLC,                     )     Stephen L. Krentz and
Defendant and Third-Party Defendant-      )     Robert P. Pilmer,
Appellee).                                )     Judges, Presiding.

---

PRESIDING JUSTICE BIRKETT delivered the judgment of the court, with opinion. Justices Hutchinson and Zenoff concurred in the judgment and opinion.

**OPINION**

¶ 1    Defendant Kimball Hill, Inc. (KH), entered into an annexation agreement (Agreement or Annexation Agreement) with plaintiff, the United City of Yorkville (City), concerning a subdivision that KH intended to develop. The Annexation Agreement required, *inter alia*, that KH complete certain public improvements in the subdivision. Pursuant to the Agreement, defendant and third-party plaintiff, Fidelity and Deposit Company of Maryland (Fidelity), issued surety bonds to KH to secure completion of the improvements. KH went bankrupt before completing the improvements. Before and during the bankruptcy proceeding, defendants and third-party defendants, TRG Venture Two, LLC (TRG), and William Ryan Homes, Inc. (WRH), purchased lots in the subdivision from KH. When TRG and WRH refused the City's demand to complete the public improvements, the City sued them along with Fidelity, which in turn brought third-party complaints against TRG and WRH. Ultimately, the trial court dismissed both the City's complaints and Fidelity's third-party complaints. Fidelity subsequently reached a settlement with the City. The City and Fidelity appeal from the dismissals. For the following reasons, we reverse and remand

¶ 2                                I. BACKGROUND

¶ 3    The three consolidated appeals in this case arise from two trial proceedings, Nos. 11-L-30 and 14-MR-90. The City initiated No. 11-L-30 in May 2011 and filed its amended complaint in January 2013. The City named Fidelity, KH, TRG, and WRH as defendants. The City initiated

No. 14-MR-90 in May 2014 and filed its amended complaint in January 2015. The City named Fidelity, KH, and TRG as defendants.

¶ 4                             A. The City's Complaints

¶ 5    For convenience, we combine into the following single narrative the factual allegations taken from the City's amended complaints.

¶ 6    The subject property is a 300-acre parcel situated partly within the City's corporate limits. The property is platted as a subdivision named Whispering Meadows (subdivision).

¶ 7    On August 12, 2003, the Annexation Agreement was signed by the City and the five record owners of the property. (Copies of the Agreement were attached to the City's amended complaints.) The named parties to the Agreement were the City, the record owners, and KH. The record owners were identified as "Owners" and KH as "Developer." The Agreement made KH responsible for constructing the public improvements for the subdivision and, to that end, required KH to furnish letters of credit or surety bonds to guarantee completion of the improvements. Regarding the Agreement's impact on successor owners and developers, section 22.B of the Agreement states:

> "22. GENERAL PROVISIONS.
>
> ***
>
> B. *Successors and Assigns*. This Agreement shall inure to the benefit of and be binding upon the OWNERS, DEVELOPER and their successors in title and interest, and upon the CITY, and any successor municipalities of the CITY. It is understood and agreed that this Agreement shall run with the land and as such, shall be assignable to and binding upon each and every subsequent grantee and successor in interest of the OWNERS and DEVELOPER, and the CITY. The foregoing to the contrary

notwithstanding, the obligations and duties of OWNERS and DEVELOPER hereunder shall not be deemed transferred to or assumed by any purchaser of a [*sic*] empty lot or a lot improved with a dwelling unit who acquires the same for residential occupation, unless otherwise expressly agreed in writing by such purchaser."

¶ 8    On October 1, 2003, the Annexation Agreement was recorded by the Kendall County Recorder.

¶ 9    On October 31, 2003, the record owners conveyed the subdivision to the Whispering Meadows Limited Partnership (Partnership).   KHA was initially the Partnership's general partner.   Subsequently, Kimball Homes Illinois, LLC (KHI), became the general partner. Eventually, the Partnership merged into KHI.

¶ 10    In February 2005, Fidelity issued four subdivision performance bonds.   Each bond identified Fidelity as surety and KH as principal.   The bonds described the improvements that KH agreed to undertake in units 1 and 2 of the subdivision.   In April 2005 and August 2007, the City agreed to reduce the bonds.

¶ 11    The City alleged that, "[i]n or around 2005," the Partnership "conveyed by warranty deeds certain unimproved lots in Unit 1 and Unit 2 of [the subdivision] to [WRH]."   WRH acquired the lots "to develop and improve them with single or multi-family residences for resale."

¶ 12    In 2008, KH, together with its related entities, including KHI, filed a voluntary petition for reorganization under the federal bankruptcy code.   Later, the reorganization proceeding was converted to a "liquidating Chapter 11."   KHI Post-Consummation Trust (Trust) was KHI's successor in the bankruptcy proceedings.   On April 30, 2009, the Trust assigned to TRG KH's status as "Founder" under the "Community Charter for Whispering Meadows" (Charter).   The

assignment stated that TRG was receiving "all of [KH's] rights, title, interest, duties and obligations in, to and under the [Charter]."

¶ 13    The City further alleged that, "[i]n or around August 30, 2010," the Trust "conveyed by special warranty deed fifty-five unimproved lots in Unit 4 of [the subdivision] to [TRG]." TRG "acquired the lots to develop and improve them with single or multi-family residences for resale."

¶ 14    The City asserted that, when TRG and WRH acquired the lots from the Partnership and the Trust, TRG and WRH became, by operation of the succession clause of section 22.B, successors to KH. As successor developers, TRG and WRH were bound to complete the public improvements required by the Annexation Agreement. The City also alleged that KH's duty to complete the public improvements was a covenant that ran with the land.

¶ 15    As to Fidelity, the City alleged that, when TRG and WRH became successor developers, Fidelity became a surety to those entities for completion of the public improvements.

¶ 16    The City further asserted that TRG and WRH failed to complete the public improvements and, therefore, breached the Annexation Agreement. The City also claimed that Fidelity breached its surety agreements by refusing the City's demand that Fidelity pay out on the bonds or complete the public improvements.

¶ 17    The City's six-count amended complaint in No. 11-L-30 alleged breach of contract. Counts I through IV named Fidelity, count V named TRG, and count VI named WRH.

¶ 18    The City's seven-count amended complaint in No. 14-MR-90 alleged breach of contract and also sought a declaratory judgment. Counts I though IV named Fidelity, and counts V through VII named TRG.

¶ 19   The City's complaints did not attach any documentation of the transfer of subdivision lots to TRG and WRH.  Some of those documents were attached to Fidelity's amended third-party complaints while others were provided during motion practice.

¶ 20                              B. Fidelity's Third-Party Complaints

¶ 21   Fidelity filed original and amended third-party complaints against TRG and WRH in No. 11-L-30 and against TRG in 14-MR-90.  Fidelity's factual allegations were consistent with the City's.

¶ 22   Fidelity attached to its complaints two warranty deeds.  The first was dated October 15, 2005, and recorded on November 17, 2005.  By that deed, the Partnership, with KHI as its sole general partner,[1] conveyed to WRH a total of 12 lots in units 1 and 2 of the subdivision.  The deed stated that the conveyance was subject to "covenants, conditions, restrictions and easements of record."  An exhibit to the deed clarified that one of the "covenants" of record was the Annexation Agreement.

¶ 23   The second warranty deed was dated April 30, 2010, and recorded on May 24, 2010.  By that deed, the Trust conveyed to TRG 72 vacant lots in units 1, 2, and 4 of the subdivision.  The deed stated that the conveyance was subject to the "[c]ovenants, conditions and restrictions of record."

¶ 24   The trial court ultimately dismissed Fidelity's third-party complaints in both cases.  Our review of those dismissals is significantly narrowed in several aspects.

¶ 25   First, Fidelity filed an appeal from the dismissal of only its amended third-party complaint in No. 11-L-30.  Moreover, Fidelity expressly disavows any challenge to the dismissal

---

[1]  For purposes of our analysis (*infra* ¶ 64), we do not distinguish between KH, KHI, the Partnership, and the Trust.

of the counts against TRG. Therefore, we are concerned only with its theories of liability against WRH. Fidelity's underlying theory in No. 11-L-30 was that the February 2005 performance bonds made KH the principal obligor—and Fidelity the secondary obligor—for completion of the public improvements specified in the bonds. When WRH received the lots from the Partnership, WRH succeeded to KH's status as the principal obligor under the Annexation Agreement. Therefore, Fidelity could seek to compel WRH to complete the public improvements or pay reimbursement for expenses that Fidelity incurred in completing them itself.

¶ 26 Counts II, III, V, and VI of Fidelity's third-party complaint in No. 11-L-30 were claims for exoneration and *quia timet*. These counts were meant to anticipatorily shift liability from Fidelity to WRH. By contrast, counts I and IV sought reimbursement from WRH in the event that Fidelity paid a judgment to the City for breach of the Annexation Agreement. In count VII, Fidelity sought relief as an assignee of KH under the Agreement.

¶ 27 Fidelity does not dispute the trial court's assessment that, when Fidelity settled with the City, all but the reimbursement claims against WRH were rendered moot.

¶ 28 Consequently, we are concerned in Fidelity's appeal only with the dismissal of counts I and IV against WRH in No. 11-L-30.

¶ 29                      C. Motions to Dismiss

¶ 30                      1. No. 11-L-30

¶ 31 WRH filed a motion to dismiss the City's amended complaint, pursuant to section 2-619 of the Code of Civil Procedure (Civil Code) (735 ILCS 5/2-619 (West 2012)). WRH asserted that, because it purchased only empty lots from KH, it met the "residential occupation" exception to successor liability in section 22.B of the Annexation Agreement.

¶ 32    WRH alternatively relied on the distinction it perceived in the Annexation Agreement between "successor owners" and "successor developers." WRH asserted that it acquired the lots from KH merely as a successor owner and, therefore, had no development duties. For this assertion, WRH relied on the "Lot Purchase Agreement" that it executed with KH on February 11, 2005. WRH attached a copy to its motion (as neither the City nor Fidelity had attached a copy to its complaint).

¶ 33    In the Lot Purchase Agreement, WRH agreed to purchase from KH 93 lots in the subdivision. (The Lot Purchase Agreement was the agreement that occasioned the October 2005 warranty deed that Fidelity produced, as well as other warranty deeds showing transfers from KH to WRH that would be produced later in the proceedings.) Specifically, WRH agreed to take

> "fee simple title to 93 lots in Kendall County, United City of Yorkville ('CITY') Illinois, bounded and described on the plat of subdivision attached to this AGREEMENT as Exhibit 'A,' being part of the Subdivision commonly known as Whispering Meadow Subdivision, having a land area of approximately ____, acres, together with all rights, privileges, and easements appurtenant thereto (all of which together are referred to in this AGREEMENT as the 'PROPERTY'), and all the improvements and fixtures, including, without limitation, all roads, curbs, sewer, and water lines and all other 'site improvements' ***."

The Lot Purchase Agreement specified that the lots would be closed upon in successive groups called "take-outs." WRH would accept at closing only "Permitable Lots," or lots that had the following improvements installed at KH's expense: (1) "[s]anitary sewer to each lot"; (2) "[w]ater service to each lot"; (3) "[s]torm sewers and structures on site"; (4) "[c]urb and gutters *** installed"; (5) "[u]nderground electric, gas, phone and telephone cable lines *** installed";

(6) "[s]edimentation and soil erosion controls *** installed"; and (7) "[r]ough grading of all lots *** completed." Moreover, "[w]ithin a commercially reasonable time subsequent to each such applicable take-out, and subject to delays beyond SELLER's reasonable control, SELLER shall cause each of the PERMITABLE LOTS to be fully completed and meet all of the criteria of improved lots ('IMPROVED LOTS')." The Lot Purchase Agreement specified the following criteria for "Improved Lots":

"A lot will be deemed to be an Improved Lot when all improvements have been completed by the SELLER, subject only to those completed by PURCHASER as noted below, which are required by the Development Plan and applicable City authorities including:

• all improvements described *** to meet the criteria for Permitted Lots

• sanitary sewer

• water service

• storm water management service

• public curbs, gutters and paved streets (including sub-grade, binder and finish courses)

• street lights

• street signs

• sidewalks as required on all public and common areas

• grading, seeding and landscaping of public and common areas

• all amenities as required by the Development Plan and applicable City authorities including such items as walking/bicycle trails, playground equipment, clubhouses, pools and other recreational facilities and entryway monumentation

> Purchaser shall be responsible for the installation of sidewalks, parkway seed/sod and parkway trees across the street frontage of each of the owned lots."

WRH also included the affidavit of Kevin Davis, who averred that he was an executive of WRH and that the attached copy of the Lot Purchase Agreement was true and accurate.

¶ 34 WRH argued that, because KH retained the duty to complete the public improvements for the lots purchased, WRH acquired the lots as simply a successor owner and, therefore, did not succeed to the duties of developer under the Annexation Agreement.

¶ 35 TRG filed its own motion to dismiss the City's amended complaint. In its motion, brought pursuant to section 2-615 of the Civil Code (*id.* § 2-615), TRG argued that (1) the Annexation Agreement did not make TRG responsible for completing the public improvements, because TRG was not a party to the Agreement and, alternatively, was not a successor in liability, as TRG met the section 22.B exception for purchasers of empty lots; (2) TRG's succession to "Founder" status under the Charter did not make it a developer of the subdivision or render it otherwise responsible for completing the public improvements; (3) the City failed to plead the basic elements of breach of contract, *i.e.*, that the Agreement was a valid and enforceable contract, that the City performed under the Agreement, and that the City suffered damages; and (4) Fidelity should bear all liability for any breach by TRG, because Fidelity assumed that risk when it became the surety.

¶ 36 WRH brought a motion to dismiss Fidelity's amended third-party complaint, pursuant to section 2-619.1 of the Civil Code (*id.* § 2-619.1). WRH argued that (1) Fidelity lacked standing to enforce the Annexation Agreement, because it was not party to it; (2) Fidelity did not properly plead a basis for indemnity; and (3) Fidelity's own exhibit—one of the warranty deeds from the

Partnership to WRH—showed that WRH was simply a purchaser of lots and did not succeed to developer status.

¶ 37    TRG brought its own motion to dismiss Fidelity's amended third-party complaint, but we need not relate the substance of that motion, because, as noted (*supra* ¶ 25), Fidelity does not raise any issue on appeal regarding it.

¶ 38                                 2. No. 14-MR-90

¶ 39    TRG moved to dismiss the City's complaint, pursuant to section 2-615 of the Civil Code. TRG's arguments were substantially similar to those it made in No. 11-L-30, except that it added the argument that the City failed to join necessary parties, namely other owners of lots in the subdivision.

¶ 40    TRG also moved to dismiss Fidelity's third-party complaint, but Fidelity does not appeal from the trial court's judgment in No. 14-MR-90 (*supra* ¶ 25).

¶ 41                    D. The Trial Court's Dismissal of the Complaints

¶ 42                                 1. No. 11-L-30

¶ 43    The trial court granted WRH's and TRG's motions to dismiss the counts against them in the City's amended complaint.  Upon review of the various documents attached to the complaint and motions, the court determined that the documents "just don't provide any basis for liability to [WRH] or to TRG."

¶ 44    The court also granted WRH's and TRG's motions to dismiss Fidelity's amended third-party complaint.  The trial court found that, "while there may be some restrictions in the deeds" from KH to WRH and TRG, "the deeds don't convey obligations to the third party defendants in this case to fulfill any of the obligations of [KH]."

¶ 45                                 2. No. 14-MR-90

¶ 46     The trial court granted TRG's motion to dismiss the counts against it in the City's amended complaint. In a detailed written order, the court found that (1) the other owners of lots in the subdivision were not necessary parties; (2) the Charter "[did] not transfer to TRG the original developer's duty to complete the public improvements and related obligations"; and (3) "[p]ursuant to the express written language of [section 22.B] of [the Annexation Agreement] ***, the obligations and duties of the Owners and Developer were not transferred or assumed by TRG."

¶ 47                                    E. Motions to Reconsider

¶ 48     The City and Fidelity filed motions to reconsider the dismissals in both cases. In support of its motion, the City attached a total of 12 warranty deeds dating from 2005 and 2007. By these deeds, the Partnership, with KHI as its general partner, transferred approximately 80 lots in the subdivision to WRH. Each deed stated that the conveyance was subject to the "covenants, conditions, restrictions and easements of record," including the Annexation Agreement.

¶ 49     Both the City and Fidelity relied on *City of Elgin v. Arch Insurance Co.*, 2015 IL App (2d) 150013, another case involving KH, TRG, and Fidelity. In *City of Elgin*, this court commented in *dicta* that, when TRG purchased sections of a development in Elgin from KH, the original developer, TRG became responsible for finishing the public improvements that were required by the original annexation agreement. *Id.* ¶ 21

¶ 50     WRH filed a joint response to the motions, claiming that *City of Elgin* was factually distinguishable. In so doing, WRH made the following assertions: (1) there was no indication in *City of Elgin* that the purchase agreement was like the Lot Purchase Agreement here, which required KH to finish the public improvements for the lots that WRH purchased; (2) in *City of Elgin*, TRG purchased "[KH's] interest in the development, including the two vacant unplatted

neighborhoods and 174 vacant homesites and 8 'outlots' in the [two] partially-developed neighborhoods" (*id.* ¶ 5), whereas here WRH "only acquired a small number of distinct lots only after those lots were 'improved' by [KH]"; (3) "the utility and sewer work on [the] individual lots [sold by the Partnership to WRH] had all been complete prior to [WRH] taking ownership of them"; (4) "[a]fter [WRH] started to acquire its interest in the lots ***, Whispering Meadows continued to sell lots in the subdivision, and [KH] kept performing under the Annexation Agreement"; (5) when, in August 2007, KH asked the City to reduce the subdivision performance bonds, WRH had already acquired all the lots it purchased from KH except one; (6) between December 2005 and October 2010, WRH sold to third parties the lots it had acquired from KH, and "by the time the agreement pertaining to TRG's acquisition of lots in the Whispering Meadows subdivision was consummated (in May of 2010), [WRH] *owned only 2 lots* in that entire subdivision"; and (7) in KH's bankruptcy proceeding, Fidelity filed eight proofs of claim indicating its potential liability under the subdivision performance bonds, and Fidelity "did not allege in [those] proofs that [WRH] was at all liable under those bonds." (Emphasis in original.)

In support of these assertions, WRH attached various documents.

¶ 51    Fidelity moved to strike the attached documents on the basis that Fidelity had not included them in any iteration of its third-party complaints.  Fidelity asserted that, "[w]hen deciding a Section 2-615 motion (or reconsidering an order granting dismissal under Section 2-615), a trial court is limited to consideration [of] the allegations and exhibits contained in the operative pleading."

¶ 52    At a combined hearing on the motions to reconsider in both cases, the court denied the motions.  The court agreed with WRH that *City of Elgin* was distinguishable because, in the

present case, TRG and WRH "only bought residential lots and did not buy unplatted neighborhoods." The court also denied Fidelity's motion to strike.

¶ 53   Fidelity ultimately settled its claims against the City. Fidelity appealed in No. 11-L-30, and the City appealed in Nos. 11-L-30 and 14-MR-90. We consolidated the appeals on our own motion.

¶ 54                                 II. ANALYSIS

¶ 55                              A. Governing Standards

¶ 56   We previously granted the joint motion of TRG and WRH to cite *Doyle v. Village of Tinley Park*, 2018 IL App (1st) 170357, as additional authority. The City has since filed a "motion for leave to distinguish" *Doyle* as additional authority. We clarified at oral argument that there is no objection to the motion, and we now grant it.

¶ 57   The City argues that the trial court erred in dismissing its counts against TRG and WRH in Nos. 11-L-30 and 14-MR-90. Fidelity argues that the court erred in dismissing its counts against WRH in No. 11-L-30.

¶ 58   TRG's motions to dismiss the City's complaints (in Nos. 11-L-30 and 14-MR-90) were brought under section 2-615 of the Civil Code. WRH's motion to dismiss the City's complaint (in No. 11-L-30) was brought under section 2-619 of the Civil Code, and its motion to dismiss Fidelity's complaint (in No. 11-L-30) was brought pursuant to section 2-619.1.

¶ 59   A motion to dismiss under section 2-615 challenges the legal sufficiency of a complaint. *Cochran v. Securitas Security Services USA, Inc.*, 2017 IL 121200, ¶ 11.

"In ruling on such a motion, a court must accept as true all well-pled facts in the complaint, as well as any reasonable inferences that may arise from them. *Id.* The essential question is whether the allegations of the complaint, when construed in the light most favorable

to the plaintiff, are sufficient to establish a cause of action upon which relief may be granted. *Id.* A cause of action should not be dismissed under section 2-615 unless it is clearly apparent from the pleadings that no set of facts can be proven that would entitle the plaintiff to recover. *Id.* Our review of an order granting a section 2-615 motion to dismiss is *de novo*." *Id.*

¶ 60 The purpose of a section 2-619 motion to dismiss is to dispose of issues of law and easily proved issues of fact at the outset of the litigation. *Van Meter v. Darien Park District*, 207 Ill. 2d 359, 367 (2003). In contrast to a section 2-615 motion, a section 2-619 motion admits the legal sufficiency of the complaint but raises defects, defenses, or other affirmative matter, appearing on the face of the complaint or established by external submissions, that defeat the claim. *Garlick v. Bloomingdale Township*, 2018 IL App (2d) 171013, ¶ 24. In ruling on a section 2-619 motion, the court interprets all pleadings and supporting documents in the light most favorable to the plaintiff. *Van Meter*, 207 Ill. 2d at 367-68. The court considers whether the existence of a genuine issue of material fact precludes dismissal or, absent such an issue of fact, whether dismissal is proper as a matter of law. *Chandler v. Illinois Central R.R. Co.*, 207 Ill. 2d 331, 341 (2003). Review of a section 2-619 dismissal is *de novo*. *Id.*

¶ 61 Finally, section 2-619.1 of the Civil Code permits a party to combine section 2-615 and section 2-619 challenges into one motion. 735 ILCS 5/2-619.1 (West 2012). The trial court's decision on such a motion is also reviewed *de novo*. *Wilson v. City of Decatur*, 389 Ill. App. 3d 555, 558 (2009).

¶ 62 B. Whether TRG and WRH Became Obligated to Complete the Subdivision's Public Improvements

¶ 63 As in the trial court, there is substantial overlap on appeal between the arguments presented by the City and Fidelity.

¶ 64    The City argues that it properly pled that, when TRG and WRH acquired lots in the subdivision from KH,[2] they became successor developers under the Annexation Agreement, and, in that capacity, were obligated to complete the public improvements required by the Agreement. The City also argues that it properly pled that the obligation to complete the public improvements transferred to TRG and WRH independently of the Agreement, because that obligation was a covenant that ran with the land.

¶ 65    Fidelity, for its part, argues that it properly pled that WRH, when it became a successor developer under the Annexation Agreement, also became the principal obligor under the surety arrangement between Fidelity and the City. Fidelity also argues that it properly pled that the obligation to complete the public improvements ran with the land, independently of the Agreement.

¶ 66    Thus, the positions of the City and Fidelity dovetail on whether WRH became a successor developer under the Annexation Agreement and on whether the obligation to complete public improvements ran with the property in question. The City further argues that, for the same reasons, TRG became obligated to complete the public improvements.

¶ 67    We begin with an analysis of the Annexation Agreement.

¶ 68                              1. The Annexation Agreement

¶ 69                                 a.  Relevant Provisions

¶ 70    The Annexation Agreement states that it was entered into under the authority of section 11-15.1-1 of the Illinois Municipal Code (Municipal Code) (65 ILCS 5/11-15.1-1 (West 2002)),

---

[2] TRG and WRH acquired lots from, respectively, the Trust and the Partnership, but for convenience we refer to either entity as simply "KH."

which permits "[t]he corporate authorities of any municipality [to] enter into an annexation agreement with one or more of the owners of record of land in unincorporated territory."

¶ 71    The Annexation Agreement recites that it was entered into by three parties:  KH, designated as "Developer"; the record owners of the property, identified collectively as "Owner" or "Record Owner"; and the City.  The Agreement imposes various duties on KH, as the developer, including the installation of public improvements.

¶ 72    Several sections of the Annexation Agreement address its binding effect on successors to the original parties.  Section 18 states:

> "18. *BINDING EFFECT AND TERM*.
>
> This Annexation Agreement shall be binding upon and inure to the benefit of the parties hereto, their successors and assigns including, but not limited to, successor owners of record, successor developers, lessees and successor lessees, and upon any successor municipal authority of the CITY and successor municipalities for a period of twenty (20) years from the later of the date of execution hereof and the date of adoption of the ordinances pursuant hereto."

Section 19 provides in relevant part:

> "19. *NOTICES AND REMEDIES*.
>
> Nothing contained herein shall require the original named OWNERS in this Agreement to undertake any of the development obligations in this Agreement; those obligations being the responsibility of the DEVELOPER of the PROPERTY and/or future OWNER/DEVELOPER of the PROPERTY."

Finally, section 22 states in relevant part:

> "22. GENERAL PROVISIONS

\*\*\*

B. *Successors and Assigns*. This Agreement shall inure to the benefit of and be binding upon the OWNERS, DEVELOPER and their successors in title and interest, and upon the CITY, and any successor municipalities of the CITY. It is understood and agreed that this Agreement shall run with the land and as such, shall be assignable to and binding upon each and every subsequent grantee and successor in interest of the OWNERS and DEVELOPER, and the CITY. The foregoing to the contrary notwithstanding, the obligations and duties of OWNERS and DEVELOPER hereunder shall not be deemed transferred to or assumed by any purchaser of a [*sic*] empty lot or a lot improved with a dwelling unit who acquires the same for residential occupation, unless otherwise expressly agreed in writing by such purchaser."

¶ 73                                  b. Various Issues of Interpretation

¶ 74    The parties raise several issues regarding the interpretation of the Annexation Agreement. We resolve them according to long-standing principles. In construing a contract, the primary goal is to give effect to the intent of the parties. *Gallagher v. Lenart*, 226 Ill. 2d 208, 232 (2007). The best indicator of intent is the contract language given its plain and ordinary meaning. *Id.* at 233.

¶ 75    TRG argues that, since it was not a party to the Annexation Agreement, it simply cannot be held liable for breaching it. TRG claims that the City has offered no "authority for the notion that the property transfer [between KH and TRG] had the effect of creating a contractual relationship sufficient to support a claim for breach of contract." TRG is mistaken. There is hardly more pertinent authority than section 11-15.1-4 of the Municipal Code (65 ILCS 5/11-

15.1-4 (West 2002)), cited by the City, which provides that an annexation agreement binds successor owners and, therefore, creates privity of contract for nonsignatories. Section 11-15.1-4 states that an annexation agreement is enforceable by "[a]ny party to such agreement." *Id.* "Parties" that are entitled to enforce annexation agreements include "successor parties." *Humphrey Property Group, L.L.C. v. Village of Frankfort*, 392 Ill. App. 3d 611, 614 (2009).

¶ 76    TRG and WRH claim that their purchases of the subdivision lots from KH made them merely successor "owners" under the Annexation Agreement, with no development duties. The City and Fidelity disagree, claiming that TRG and WRH became both successor "owners" and successor "developers" under the Agreement.

¶ 77    TRG and WRH are at pains to emphasize the distinction between "owner" and "developer" in the Annexation Agreement. They note, accurately, that different duties are assigned to "owner" and "developer." However, though consistently referenced as simply "developer," KH was, to be precise, both "developer" and "owner," though not an "owner of record" as that designation is defined. WRH asserts that "nothing in the Annexation Agreement states that successor owners somehow transform into successor developers." We agree that successor owners are not *per se* successor developers, but it is possible for a party to be both. Section 19 of the Agreement states that development of the property is "the responsibility of the DEVELOPER of the PROPERTY and/or future OWNER/DEVELOPER of the PROPERTY." Thus, a party can be a successor owner *and/or* a successor developer of the property.

¶ 78    WRH also contends that one who succeeds to the interests of a party under the Annexation Agreement does not necessarily succeed to the party's obligations under the Agreement. WRH relies here on the statement in section 22.B that "[i]t is understood and agreed that this Agreement shall run with the land and as such, shall be *assignable* to and binding upon

each and every subsequent grantee and successor in interest of the OWNERS and DEVELOPER, and the CITY." (Emphasis added.) WRH suggests that, if duties under the Agreement are only "assignable," then they are not automatically assigned when a party's interests are transferred.

¶ 79    WRH overlooks the far greater amount of textual evidence indicating that a party's duties necessarily transfer along with its interests (barring, as we note below, the "residential occupation" exception in section 22.B). The sentence immediately preceding the one that WRH relies on reads: "This Agreement *shall* inure to the benefit of and be binding upon the OWNERS, DEVELOPER and their successors in title and interest, and upon the CITY, and any successor municipalities of the CITY." (Emphasis added.) Similar language appears in section 18:

> "This Annexation Agreement *shall* be binding upon and inure to the benefit of the parties hereto, their successors and assigns including, but not limited to, successor owners of record, successor developers, lessees and successor lessees, and upon any successor municipal authority of the CITY and successor municipalities for a period of twenty (20) years from the later of the date of execution hereof and the date of adoption of the ordinances pursuant hereto." (Emphasis added.)

¶ 80    In addition to these instances of "shall," indicating the necessary transference of duties, section 19 states that development duties are the responsibility not of the "original named OWNERS" but of "the DEVELOPER of the PROPERTY and/or future OWNER/DEVELOPER of the PROPERTY." The import here is that development duties bind a successor developer in the same manner that they bound the original developer. Thus, to the extent that "assignable" suggests that the succession of duties is optional, we regard it as an outlier in the contract language.

¶ 81    Both TRG and WRH also rely on the final sentence of section 22.B, which states an exception to the automatic succession of duties.  That language provides:

"[T]he obligations and duties of OWNERS and DEVELOPER hereunder shall not be deemed transferred to or assumed *by any purchaser of a* [*sic*] *empty lot or a lot improved with a dwelling unit who acquires the same for residential occupation*, unless otherwise expressly agreed in writing by such purchaser."  (Emphasis added.)

¶ 82    The parties disagree at several points over the interpretation of this language.   We begin with the City's assertion that the use of the singular "lot" ("*a* [*sic*] empty lot or *a* lot improved with a dwelling unit" (emphases added)) means that a purchaser of more than one lot is *per se* disentitled to the exception, regardless of whether the purchaser "acquires the same for residential occupation."   Hence, because TRG and WRH each purchased multiple lots, they cannot claim the exception.

¶ 83    TRG claims that the City forfeited this point by failing to raise it in the trial court.  TRG is mistaken; the City raised the point below, albeit not until its motion to reconsider (but TRG's claim is not that the City raised the point too late below, but that it did not raise it at all).

¶ 84    In any case, we reject the City's construction of the singular nouns.  As the City itself argues (and as we accept, *infra ¶* 88), the phrase "acquires *** for residential occupation" is a restrictive modifier of both "[an] empty lot" and "a lot improved with a dwelling unit."   In this situation, we have recourse to the rule that " 'a' refers to 'any or each' of a type when used with a subsequent restrictive modifier." *Retreat at Port of the Islands, LLC v. Port of the Islands Resort Hotel Condominium Ass'n,* 181 So. 3d 531, 533 (Fla. Dist. Ct. App. 2015) (citing Webster's Third New International Dictionary 1 (2d ed. 1986)); see also *United States v. Alabama,* 778 F.3d 926, 932 (11th Cir. 2015) ("In common terms, when 'a' or 'an' is followed

by a restrictive clause or modifier, this typically signals that the article is being used as a synonym for either 'any' or 'one.' "). In other words, the singular article does not restrict the quantity of the subject but simply indicates membership in a certain class. See *Retreat at Port of the Islands*, 181 So. 3d at 533 (In clause, " 'If a unit is owned by a limited liability company, only a managing member may be Director,' " " 'managing member' does not refer to one single managing member but rather all managing members of the LLC. We thus construe 'a' to indicate a restriction on the class of individuals from an LLC qualified to serve on the board of directors, not the number of those otherwise qualified individuals to serve on the board.").

¶ 85 In light of this rule, "a [*sic*] empty lot or a lot improved with a dwelling unit *** acquire[d] *** for residential occupation" does not mean that the exception is restricted to the purchase of only a single lot for residential occupation. Rather, it means that the purchase of lots, of whatever quantity, will meet the exception if the lots were purchased for residential occupation. Such a reading jibes with the obvious reality that a purchase of two or more lots might be for residential purposes, as when the purchaser intends to combine them into a single lot for construction of a residence.

¶ 86 The next point of contention concerns whether the purchaser of an empty lot (or lots) is, without more, exempt from the duties of a successor under the Annexation Agreement. According to TRG and WRH, the qualifying phrase, "acquires the same for residential occupation," applies only to the purchase of a lot improved with a dwelling unit. Thus, in their view, the purchaser of an empty lot (or lots) is exempt from duties under the Agreement regardless of whether residential occupation was the intent of the purchase.

¶ 87    The City, on the other hand, interprets the relevant language to mean that the purchaser of *either* an empty lot *or* a lot improved with a dwelling unit is subject to duties under the Annexation Agreement unless the lot was purchased for residential occupation.

¶ 88    TRG and WRH submit that the City is reading the language as if the clause "or a lot improved with a dwelling unit" were set off with the following two bracketed commas:

> "[T]he obligations and duties of OWNERS and DEVELOPER hereunder shall not be deemed transferred to or assumed by any purchaser of a [*sic*] empty lot[,] or a lot improved with a dwelling unit[,] who acquires the same for residential occupation, unless otherwise expressly agreed in writing by such purchaser."

Yet TRG's and WRH's reading seems to interpolate its own punctuation to set off the larger clause, "or a lot improved with a dwelling unit who acquires the same for residential occupation":

> "[T]he obligations and duties of OWNERS and DEVELOPER hereunder shall not be deemed transferred to or assumed by any purchaser of a [*sic*] empty lot[,] or a lot improved with a dwelling unit who acquires the same for residential occupation, unless otherwise expressly agreed in writing by such purchaser."

"Just as the court may not rewrite the contract of the parties by altering the language used by the parties, the court may not change the meaning of the contract by inserting punctuation which was not selected by the parties." *Bailey v. State Farm Fire & Casualty Co.*, 267 Ill. App. 3d 653, 661 (1994). In our view, the language is clear as is. "Who" begins the adjective clause, "who acquires the same for residential occupation." TRG and WRH essentially divide the clause. They allow that "who" refers back to "any purchaser," but they claim that "acquires the same" refers only to the immediately preceding "lot improved with a dwelling unit." The alternative to

this strained reading is to construe the entire adjective clause beginning with "who" as referring back to "any purchaser." This yields the same meaning as if the language had read:

> "[T]he obligations and duties of OWNERS and DEVELOPER hereunder shall not be deemed transferred to or assumed by any purchaser *who acquires for residential occupation* an empty lot or a lot improved with a dwelling unit, unless otherwise expressly agreed in writing by such purchaser." (Emphasis added.)

¶ 89    TRG and WRH assert that this reading is impractical on several grounds, but none of their objections has merit. First, WRH asserts that "no one can 'occupy' an empty lot for residential occupation until it is improved with a dwelling unit," and, thus, the City's and Fidelity's reading "would actually make it impossible for a purchaser of an empty lot to ever escape responsibility for performing the developer responsibilities under the Annexation Agreement." We disagree. Section 22.B does not state that the intent must be for *immediate* residential occupation. In this connection, we note that our reading of section 22.B not only is dictated by the formal structure of the language but also avoids an absurd result. A contract should be construed, if reasonably possible, to avoid an absurd result. *Smith v. West Suburban Medical Center*, 397 Ill. App. 3d 993, 1001 (2010). A major component of a residential developer's work is the development of empty lots, yet, under TRG's and WRH's proposed reading, a developer who purchases only empty lots in the subdivision is *per se* exempt from development duties under the Annexation Agreement (absent the developer's consent, of course). TRG and WRH suggest no reason why the parties to the Agreement would permit such a windfall for developers buying into the subdivision.

¶ 90    Second, WRH claims that the City's and Fidelity's reading would create the "absurd" result that "a purchaser who buys even one empty lot in the subdivision would be responsible for

performing *all of the public improvements for the subdivision as a whole*." (Emphasis in original.) WRH assumes that responsibility for public improvements under the Annexation Agreement will fall entirely on one developer at a time. WRH points to nothing in the Agreement to support this notion, and in fact the text rebuts it. The Agreement places no restrictions on the severability of the property for purposes of sale. Tellingly, section 9 of the Agreement refers to the rights and duties of "DEVELOPER and all successor developers of *the PROPERTY or any parcel or phase thereof*." (Emphasis added.) From this we infer that the property may be conveyed to a successor developer in whole *or* in part and that one or more developers of the property may exist at any given time. Complementarily, section 22.B places no restriction on the number of successor developers that may exist at any given time, each having succeeded to the duties of the original developer, KH. Those duties would not fall entirely on any particular one of those successor developers, but would be shared among them. In short, the Agreement allows for multiple developers and shared liability for development duties. In WRH's hypothetical, a developer's purchase from KH of only one lot in the subdivision would indeed make the purchaser responsible for completing public improvements. However, the successor developer would not be solely responsible for the improvements but would be jointly liable with KH to the extent that it retained an interest in the subdivision.

¶ 91 We found joint developer liability in *Village of Montgomery v. Fidelity & Deposit Co. of Maryland*, 2016 IL App (2d) 150571-U, another case involving TRG, KH, and Fidelity. In *Village of Montgomery*, KH was the original developer under an annexation agreement with the Village of Montgomery (Village). That agreement, like the Annexation Agreement in the present case, had a clause binding successor developers. Per the agreement, KH obtained from Fidelity a subdivision performance bond to guarantee completion of the public improvements

required under the agreement. Unlike the Agreement in the present case, the annexation agreement in *Village of Montgomery* had a provision releasing the original developer from its development duties. Specifically, the agreement stated that, " '[u]pon sale or transfer of any portion of the Property,' " KH would be relieved of its development duties under the agreement if the Village received and accepted a substitute letter of credit or performance bond. *Id.* ¶ 6.

¶ 92 Subsequently, in 2008, KH filed for bankruptcy. It had sold some homes but failed to complete the subdivision's public improvements. By special warranty deed, TRG received the remaining unimproved lots in the subdivision. The Village had not received from KH, however, a substitute letter of credit or performance bond. Consequently, we held

> "that both [KH], which has not been completely released of its obligations, and TRG, as successor owner who assumed the annexation agreement's obligations upon acquisition of [KH's] remaining property, are now jointly primarily liable to the Village for completion of the public improvements at issue and that Fidelity remains only secondarily liable to both TRG and [KH]." *Id.* ¶ 26.

As in *Village of Montgomery*, under the Annexation Agreement, liability for multiple successor developers is joint.

¶ 93 Next, assuming that the qualifier, "acquires *** for residential occupation," is read to apply to both empty and improved lots, TRG asserts that the intended residential occupation need not be the purchaser's *own* residential occupation. TRG submits that "even an intention to improve the lot with a residential property, and to sell it, is not incompatible with the intention that the property be used for eventual 'residential occupation'—because there is nothing in the exception that depends upon the purchaser taking up residence there." Thus, TRG is bold enough to suggest that residential developers, *i.e.*, parties building or renovating residences for

sale to third parties, are exempt from the succession clause. We reject this reading as absurd. An exemption of the scope that TRG suggests would consume the succession clause, which was meant to bind successor developers to the terms of the Annexation Agreement. While "acquires *** for residential occupation" is not defined in the Agreement, we infer that the drafters intended at a minimum to exclude residential developers from that definition.

¶ 94 We clarify another aspect of section 22.B. At oral argument, WRH asserted that section 22.B permits KH to retain what would have been the successor developer's share of the development responsibilities under the Annexation Agreement. We quote again the relevant portion of section 22.B:

> "The foregoing to the contrary notwithstanding, the obligations and duties of OWNERS and DEVELOPER hereunder shall not be deemed transferred to or assumed by any purchaser of a [*sic*] empty lot or a lot improved with a dwelling unit who acquires the same for residential occupation, *unless otherwise expressly agreed in writing by such purchaser.*" (Emphasis added.)

WRH referenced the italicized language, but misconstrued it. This language permits a residential purchaser to take on development duties; it does not permit a successor developer to absolve itself of development duties.

¶ 95 At this point we discuss *Doyle*, which TRG and WRH cite as bearing on the interpretation of not only the Annexation Agreement but also section 11-15.1-4 of the Municipal Code (65 ILCS 5/11-15.1-4 (West 2002)). In *Doyle*, the plaintiffs contracted with a subdivision's developer, Malone & Moloney (Malone), for the construction of a residence on an individual lot in the subdivision. Malone had entered into an annexation agreement with the Village of Tinley Park (Village) regarding the subdivision. The annexation agreement provided

that it would be " 'binding upon and inure to the benefit of the parties hereto, successor owners of record of the Subject Property, assignees, lessees and upon any successor municipal authorities of said Village and successor municipalities ***.' " *Doyle*, 2018 IL App (1st) 170357, ¶ 17. Several years after purchasing the lot, the plaintiffs sued the Village and Malone for breach of the annexation agreement. The plaintiffs claimed standing to enforce the agreement on the ground that they were "successor owners" under both the agreement and section 11-15.1-4. The appellate court disagreed.

¶ 96    First, the court addressed the annexation agreement:

"The agreement defines the 'Subject Property' as an 828-acre parcel of land contiguous with the village—*i.e.*, the entire subdivision. If the drafters of the agreement intended to confer successor status upon each and every purchaser of a lot within the subdivision (as opposed to say, a developer who purchased the entire subdivision property from Malone), the agreement would have said 'successor owners of record of the Subject Property *or any portion thereof*.' " (Emphasis in original.) *Id.* ¶ 30.

¶ 97    Next, the court examined section 11-15.1-4, which provides:

"Any annexation agreement executed pursuant to this Division 15.1, or in conformity with Section 11-15.1-5 hereof, *shall be binding upon the successor owners of record of the land which is the subject of the agreement* and upon successor municipal authorities of the municipality and successor municipalities. Any party to such agreement may by civil action, mandamus, injunction or other proceeding, enforce and compel performance of the agreement.

A lawsuit to enforce and compel performance of the agreement must be filed within the effective term of the agreement or within 5 years from the date the cause of

action accrued, whichever time is later." (Emphasis added.) 65 ILCS 5/11-15.1-4 (West 2012).

¶ 98 The court held that the plaintiffs could not be considered "successor owners" under section 11-15.1-4:

"[T]he statute refers to 'successor owners of record of the land which is the subject of the agreement' [citation], but makes no reference to those who purchase only a small portion of that land. [The plaintiffs] do not cite any cases where homeowners who purchase a single lot from a larger annexed territory are considered 'successor owners of record' under the statute, nor does our research disclose any.

Moreover, if we adopted [the plaintiffs'] interpretation of the *** statute, then each and every homeowner in the subdivision would succeed to Malone's interest in the property. [Citation.] As successors, the homeowners would stand in Malone's shoes and be bound to Malone's obligations—and, as a result, the village could sue [the plaintiffs] or any other homeowners in the subdivision, for failing to properly design and construct storm sewers in accordance with the annexation agreement. [Citation.] We decline to find that *** the legislature intended such an absurd result." *Doyle*, 2018 IL App (1st) 170357, ¶¶ 31-32.

¶ 99 *Doyle* does not apply to the facts before us. First, the Annexation Agreement contains language that we presume the annexation agreement in *Doyle* did not contain. Early in the Annexation Agreement, the "PROPERTY" is described as "consisting of approximately 300 acres." However, as noted, section 9 of the Agreement refers to the rights and duties of "DEVELOPER and all successor developers of the PROPERTY *or any parcel or phase thereof.*" (Emphasis added.) This language contemplates that the original "PROPERTY" might eventually

be owned by more than one developer. Construed together, section 9 and section 22.B indicate that development duties can indeed fall on a developer that owns less than the entire "PROPERTY," in which case the liability will be proportionate to the amount of property that the developer owns. We are not privy to the entire agreement in *Doyle*, but we presume that the absence of language comparable to section 9 led the court to hold that the annexation agreement would bind only "a developer who purchased the entire subdivision property from Malone." *Id.* ¶ 30.

¶ 100 As for *Doyle*'s analysis of section 11-15.1-4, we think that the court should have contrasted two types of parties who purchase from the original developer a portion of subdivided land that is the subject of an annexation agreement. The first is a party who, like the plaintiffs in *Doyle*, purchases a lot in order to construct, or have constructed, a residence for himself. The second is a party—namely a developer—who purchases lots in order to construct homes for third-party buyers. We agree with the *Doyle* court that it would be unfair to impose the obligations of an annexation agreement upon the first type of purchasers. However, it would be eminently fair to impose those obligations upon the second type—developers—even though, like the first type, they do not purchase the entirety of "the land which is the subject of the [annexation] agreement." See 65 ILCS 5/11-15.1-4 (West 2002). Not uncommonly, a unitary tract of land governed by an annexation agreement is later divided and sold to different developers, as happened in this case. The public policy in favor of ensuring the fulfillment of an annexation agreement (see *Village of Orland Park v. First Federal Savings & Loan Ass'n of Chicago*, 135 Ill. App. 3d 520, 526 (1985)) would be frustrated if the succession of duties under section 11-15.1-4 continued only as long as the land remained under common ownership.

¶ 101   We acknowledge, however, that the foregoing distinction between types of purchasers is not apparent on the face of section 11-15.1-4.  Technically, *both* (1) the purchaser of a lot for residential purposes *and* (2) the purchaser of lots for development purposes are "successor owners of record of the land which is the subject of the agreement."  See 65 ILCS 5/11-15.1-4 (West 2002).  However, we need not decide this issue of statutory interpretation, because, as we elaborate below, we hold that the terms of the Annexation Agreement provide adequate grounds for holding TRG and WRH to the duties specified therein.

¶ 102   We summarize the main points of our analysis so far.  First, a party's duties under the Annexation Agreement transfer necessarily to successors in interest.  Second, section 22.B's exception for purchases of lots "for residential occupation" applies alike to purchases of single and multiple lots, whether empty or improved.  Third, acquisition of lots for development purposes, *i.e.*, for construction or renovation of residences for sale to third parties, is not acquisition "for residential occupation."  Fourth, the Annexation Agreement permits joint liability among the original developer and a successor developer or developers.  Finally, section 22.B permits a residential purchaser to assume development duties but has no language permitting a successor developer to avoid development duties.

¶ 103          c. Applying the Annexation Agreement to TRG and WRH

¶ 104   Having settled some points of interpretation regarding the Annexation Agreement, we proceed to apply the Agreement to TRG and WRH.

¶ 105   We reiterate the relevant parts of section 22.B:

> "This Agreement shall inure to the benefit of and be binding upon the OWNERS, DEVELOPER and their successors in title and interest, and upon the CITY, and any successor municipalities of the CITY.  It is understood and agreed that this Agreement

shall run with the land and as such, shall be assignable to and binding upon each and every subsequent grantee and successor in interest of the OWNERS and DEVELOPER, and the CITY. The foregoing to the contrary notwithstanding, the obligations and duties of OWNERS and DEVELOPER hereunder shall not be deemed transferred to or assumed by any purchaser of a [*sic*] empty lot or a lot improved with a dwelling unit who acquires the same for residential occupation, unless otherwise expressly agreed in writing by such purchaser."

¶ 106   Applying this language to TRG and WRH is straightforward. Each entity undisputedly acquired "title and interest" from the original developer, KH. In succeeding to that "title and interest," TRG and WRH became bound to perform the duties that were KH's under the Agreement, including the completion of the public improvements. The City and Fidelity further alleged that TRG and WRH purchased lots from KH with the intent to improve them with residences and then resell them. TRG and WRH have never denied this intent (and, in fact, they conceded that intent at oral argument). Thus, the City and Fidelity properly alleged that TRG and WRH, as owners *and* developers, do not qualify under section 22.B's exception for purchasers of lots for residential occupation.

¶ 107   TRG and WRH argue, based on the particular circumstances under which they purchased their lots, that they did not succeed to the duties of KH. First, TRG notes that it purchased "fewer than half the lots that were part of the property at issue in the Annexation Agreement." Therefore, according to TRG, "the land that [it] purchased is not the same land to which the Annexation Agreement applied—the land with which [KH's] obligations allegedly ran." However, as we have noted, the Annexation Agreement allows for the possibility of multiple

successor developers, which would be jointly responsible for fulfilling the duties of the original developer.

¶ 108    Here we discuss *City of Elgin*, which the City and Fidelity relied on below but which the trial court held was distinguishable from the present case. In *City of Elgin*, Elgin entered into an annexation agreement (agreement) with KH for the development of a subdivision. The agreement bound KH and its successor developers to complete the public improvements. Pursuant to the agreement, KH obtained bonds from Fidelity to guarantee completion of the improvements. Before KH went bankrupt in April 2008, it sold improved lots in four of the six neighborhoods in the development. The remaining two neighborhoods were still unplatted and unimproved. In 2010, TRG purchased, from a trust handling the bankruptcy estate, KH's interest in the development, "including the two vacant unplatted neighborhoods and 174 vacant homesites and 8 'outlots' in the partially-developed neighborhoods." *City of Elgin*, 2015 IL App (2d) 150013, ¶ 5.

¶ 109    When TRG refused to complete the public improvements required under the agreement, Elgin sued TRG and Fidelity. Elgin alleged that TRG, as successor to KH under the agreement, was responsible for completing the public improvements and that, to the extent that KH was unwilling or unable to finish the work, Fidelity was liable on the bonds it issued. Fidelity answered the complaint and also filed a three-count counterclaim alleging that TRG was primarily responsible for completing the public improvements. Count I was a claim for reimbursement and indemnification based on the theory that TRG, as KH's successor in interest, was primarily responsible for completing the improvements under the agreement and that Fidelity was only secondarily liable. Fidelity alleged that TRG had a common-law and a contractual duty to reimburse Fidelity for any amounts it was required to pay on the bonds.

Count II was titled " 'exoneration' " and asserted that TRG, as the " '*de facto* principal' " under the bonds, owed Fidelity a duty under the bonds to protect it from loss. Count III, titled " '*Quia Timet*,' " sought to require TRG to deposit collateral with Fidelity in order to protect it from loss. *Id.* ¶¶ 6-7.

¶ 110 The parties filed various dispositive motions. The trial court granted TRG's motion to dismiss Elgin's claims against it, denied Fidelity's motion for summary judgment, and granted Elgin's motion for partial summary judgment against Fidelity. The court's reasons for these rulings were that (1) the annexation agreement was a covenant running with the land, and hence its validity was not affected by KH's bankruptcy; (2) nonetheless, the bankruptcy discharged KH's obligations under the agreement, and, because there was no reservation of rights on Elgin's part, it could not proceed against Fidelity under the agreement; (3) Elgin could, however, proceed against Fidelity under the surety bonds because they were contracts separate from the agreement; (4) TRG, as a subsequent purchaser under the agreement, became bound by its terms; and (5) Elgin failed to join all parties situated similarly to TRG. *Id.* ¶¶ 9-13.

¶ 111 After the trial court made these rulings, Fidelity amended its counterclaim against TRG to add a count of unjust enrichment. TRG moved to dismiss the amended counterclaim. TRG argued that (1) Fidelity failed to name all necessary parties, namely individual homeowners who purchased improved lots and (2) TRG could not be liable to Fidelity on the bonds, because TRG was not a party to the bonds and had no relationship to Fidelity. The trial court granted TRG's motion without providing a rationale. *Id.* ¶ 13.

¶ 112 Elgin subsequently settled with Fidelity and voluntarily nonsuited its claims against TRG, which retained all rights and defenses. *Id.* ¶ 14. Fidelity appealed the dismissal of its

counterclaim against TRG. We held that Fidelity sufficiently pled all four counts of its counterclaim and that Fidelity did not fail to name necessary parties. *Id.* ¶¶ 17-44.

¶ 113 We focus at this juncture on two discussion points in *City of Elgin* that the parties cite on the issue of whether TRG and WRH succeeded to the duties of developers under the Annexation Agreement. (We discuss more of *City of Elgin* in our analysis of Fidelity's claims below.)

¶ 114 First, we noted in *City of Elgin* that the gravamen of Fidelity's complaint was that "TRG assumed [KH]'s obligations under the [agreement] and is now the 'principal obligor' that must perform the underlying obligation." *Id.* ¶ 22. The trial court had agreed with Fidelity that the obligation to complete the public improvements was a covenant that ran with the land. However, because of the voluntary dismissal of Elgin's complaint against TRG, the issue of TRG's liability under the agreement was "not before us" on appeal. *Id.* ¶ 21. Though TRG had "reserved its right to contest [the] holding ***, we accept[ed] it for the purposes of analyzing the sufficiency of Fidelity's counterclaim." *Id.* We then offered the following comments, which we acknowledged were not a "final determination of [TRG's] liability":

"The [agreement], which was recorded shortly after it was entered into, clearly provides that any subsequent development of the property must comply with the terms therein. The agreement provides that it is binding on successors and assigns and that its terms constitute a covenant running with the land. Moreover, state law likewise provides that annexation agreements 'shall be binding upon the successor owners of record of the land which is the subject of the agreement.' 65 ILCS 5/11-15.1-4 (West 2012). On the record before us, TRG's successor liability would appear to be a matter of public record and statutory law, which is incorporated into every contract unless the contract provides to the contrary. [Citation]." *Id.*

¶ 115   The second aspect of our discussion in *City of Elgin* that the parties find pertinent here is our analysis of TRG's argument that Fidelity failed to name necessary parties, namely "those individual homeowners who had bought homes in the development." *Id.* ¶ 34.   We noted that Fidelity's claim that TRG was responsible for completing the public improvements was based on paragraph 45 of the agreement, which stated in pertinent part:

> " 'in the event all or any portion of the [development] is sold or conveyed at any time during the terms of this Agreement, all of the obligations and responsibilities of the Developer deriving from this Agreement for the parcel sold or otherwise conveyed shall devolve upon and be assumed by such purchaser or grantee, and the Developer *** shall be released from all obligations of the Developer which relate to the sold portion of the [development] upon same being sold or conveyed.' " *Id.* ¶ 39.

TRG argued that, if this provision imposed upon TRG the duty to complete the improvements upon TRG's acquisition of the remaining property in the development, then individual lot owners would also be responsible for the improvements.   Thus, those owners should have been joined as parties.   See *id*.

¶ 116   We rejected TRG's point on two grounds.   First, because TRG did not elaborate on it or cite legal authority, the point was forfeited.   *Id.* (citing Ill. S. Ct. R. 341(h)(7) (eff. Feb. 6, 2013)).   Second, the point lacked merit.   We said:

> "Paragraph 45 does not impose a universal and unlimited obligation to make all improvements anywhere in the development upon anyone who purchased property in the development.   Rather, it imposes upon purchasers the obligations 'of the Developer *** for the parcel sold.'   Thus, the obligations imposed upon any particular purchaser depend upon the obligations of [KH] that remain unsatisfied with respect to the specific 'parcel

sold.' If these obligations have already been satisfied with respect to the parcel—as would be the case where [KH] or some other entity had already completed the improvements at issue with respect to the homes that were sold—the individual purchasing homeowners would not be subject to any liability under paragraph 45. Accordingly, they would not have an interest requiring protection." *Id.* ¶ 40.

¶ 117 Our remarks in *City of Elgin* about TRG's status under the agreement—which we recognized as an "issue *** not before us" (*id.* ¶ 21)—were *dicta*. There are two types of *dicta*. " '*Obiter dictum*,' frequently referred to as simply '*dictum*,' is a remark or opinion that a court uttered as an aside." *Lebron v. Gottlieb Memorial Hospital*, 237 Ill. 2d 217, 236 (2010). Such a comment is considered an "aside" because it pertains to an issue that was not before the court. See *Gorin v. McFarland*, 80 Ill. App. 2d 398, 413 (1967). "*Obiter dictum* is not essential to the outcome of the case, is not an integral part of the opinion, and is generally not binding authority or precedent within the *stare decisis* rule." *Lebron*, 237 Ill. 2d at 236. *Obiter dictum* may still have some persuasive value, however. *In re Former Marriage of Donnelly*, 2015 IL App (1st) 142619, ¶ 19.

¶ 118 In contrast to *obiter dictum*, judicial *dictum* is "an expression of opinion upon a point in a case argued by counsel and deliberately passed upon by the court, though not essential to the disposition of the cause." *Schweihs v. Chase Home Finance, LLC*, 2016 IL 120041, ¶ 41. Judicial *dictum* should be followed unless found to be erroneous. *Lebron*, 237 Ill. 2d at 236.

¶ 119 In *City of Elgin*, Elgin's voluntary dismissal of its action against TRG removed from contention the issue of whether, as the trial court found, TRG was bound by the duties of the agreement. Therefore, since the issue was not before us, our comments are properly considered *obiter dicta* and have at most persuasive value. Even that value is limited, however, because we

noted that our conclusions were not definitive, and, indeed, we stated them tentatively. *City of Elgin*, 2015 IL App (2d) 150013, ¶ 21 ("On the record before us, TRG's successor liability *would appear* to be a matter of public record and statutory law, which is incorporated into every contract unless the contract provides to the contrary." (Emphasis added.)).

¶ 120    Although some of the parties here recognize that our comments were *obiter dicta*, they nonetheless argue over whether the factual underpinnings of that *dicta* are sufficiently similar to the facts at hand here. For instance, WRH provides an elaborate chart to illustrate the differences between this case and the facts that informed our conclusion in *City of Elgin* that TRG was bound as a successor developer under the agreement. But we decline to compare this case and the facts that underlay our tentative finding, in *obiter dicta*, that TRG was liable as a successor developer.

¶ 121    Our remaining discussion in *City of Elgin*, however, was not *dicta*, and WRH relies on our analysis there of the necessary-parties issue. WRH's contention consists of these six points: (1) under the Annexation Agreement, the original developer's duties do not necessarily transfer to a successor in title and interest, but rather the developer may contractually agree to retain those duties; (2) when WRH purchased the lots pursuant to the Lot Purchase Agreement, WRH did not become obligated to complete the public improvements for those lots, but rather KH's completion of the improvements for those lots was a condition of the sale; (3) neither the Annexation Agreement, the Lot Purchase Agreement, nor the warranty deeds indicate that WRH was acquiring an interest in any of the "public improvements" or "public areas" in the subdivision; (4) the public improvements for the lots acquired by WRH were, in fact, finished before WRH acquired the lots; (5) after WRH purchased the lots, KH, Fidelity, and the City continued to act as if KH were still obligated to complete the public improvements in the

subdivision; and (6) before it was named in this litigation, WRH sold to third parties all of the lots it had purchased from KH.

¶ 122   In the trial court, WRH made some of these points for the first time in its joint response to the City's and Fidelity's motions to reconsider the dismissals.   WRH likewise relied on documents that it produced for the first time in its response.   Fidelity moved to strike the documents, but the trial court denied the motion.   On appeal, Fidelity criticizes that ruling in its statement of facts but fails to develop the point in its argument.   Consequently, the point is forfeited.   See Ill. S. Ct. R. 341(h)(7) (eff. May 25, 2018).

¶ 123   We nonetheless reject WRH's contention.   We address its supporting points in turn.   As for points (1) and (2), we have already determined that the original developer's duties under the Annexation Agreement pass automatically to parties who acquire, for development purposes, the original developer's "title and interest."   WRH relies on the Lot Purchase Agreement and cites cases for the principle that a party's contractual obligations cannot be enlarged absent that party's consent.   See *In re Marriage of Frank*, 2015 IL App (3d) 140292, ¶ 13 ("A party cannot *ex parte* modify a contract without the knowledge and consent of the other party.").   Thus, WRH argues that its duties under the Lot Purchase Agreement cannot be enlarged absent its agreement. WRH has the principle correct but its application profoundly incorrect.   The Annexation Agreement was the prior agreement, the parties to which were the City, KH, and the record owners.   Section 22.B, as we noted, contains no provision for a successor developer to contractually avoid development duties to which it would otherwise succeed under the Annexation Agreement.   The Lot Purchase Agreement was in essence an attempt to modify section 22.B's succession clause by permitting KH to retain exclusive responsibility for

development duties with respect to the lots WRH acquired. As WRH's own cases dictate, KH had no authority to unilaterally modify the Annexation Agreement.

¶ 124  As for point (3), WRH's reliance on the Annexation Agreement is misplaced, because the Agreement places no restriction on which interests KH may convey to purchasers. As for the Lot Purchase Agreement and the warranty deeds, WRH cites no language in any of those documents to support its claim that KH reserved ownership of "public areas" or "public improvements." In fact, the Lot Purchase Agreement provides that WRH will acquire fee simple title to 93 lots, together with easements, improvements, and fixtures.

¶ 125  WRH asserts the relevance of point (4) by reference to our discussion of TRG's necessary-parties argument in *City of Elgin*. The agreement in that case made a successor developer responsible for development related only to the specific parcel(s) acquired. *City of Elgin*, 2015 IL App (2d) 150013, ¶ 40. Thus, we said, "[i]f [the development] obligations have already been satisfied with respect to [the] parcel ***[,] the individual purchasing homeowners would not be subject to any liability under [the agreement]." *Id.* With point (4), WRH seems to be asserting that, even if it were responsible for the public improvements for the lots purchased, the City's and Fidelity's claims would fail because the public improvements were in fact completed, as a condition of WRH's purchase of the lots.

¶ 126  The basic flaw in point (4) is that it simply contests the City's and Fidelity's factual allegations that WRH failed to complete the public improvements in the subdivision. WRH did not move for dismissal on the ground that the City or Fidelity failed adequately to plead that the improvements were unfinished. See *Pilotto v. Urban Outfitters West, L.L.C.*, 2017 IL App (1st) 160844, ¶ 8 ("Illinois is a fact-pleading state; conclusions of law and conclusory allegations unsupported by specific facts are not sufficient to survive dismissal."). Instead, WRH sought to

directly rebut the allegations by establishing that KH completed the public improvements for the lots before WRH acquired them. However, neither section 2-615 nor section 2-619 is a proper avenue to contest the truth of a factual allegation. *Reynolds v. Jimmy John's Enterprises, LLC*, 2013 IL App (4th) 120139, ¶ 51. Section 2-619 does allow the movant to seek dismissal based on easily proven issues of fact, but those facts must relate to the affirmative matter that is the asserted basis for dismissal. *Id.* ¶ 30. Proof that the public improvements were in fact completed for the lots WRH purchased is not affirmative matter but a direct challenge to the factual accuracy of the City's and Fidelity's claims.

¶ 127 Point (5) ultimately assumes that WRH's legal responsibility under the Annexation Agreement depended on whether the City, Fidelity, and KH acted as if WRH were responsible. WRH does not elaborate on, or cite authority for, this assumption. Consequently, the point is forfeited. See Ill. S. Ct. R. 341(h)(7) (eff. May 25, 2018) (points not developed are forfeited).

¶ 128 Point (6) appears to assume that, after selling the lots to third parties, WRH could no longer be held liable for failing to complete the public improvements while it owned the lots. This point, too, is forfeited for lack of development. See *id.*

¶ 129 For the foregoing reasons, we hold that the City and Fidelity sufficiently alleged that TRG and WRH were successor developers under the Annexation Agreement. We have interpreted the Agreement only to the extent necessary to resolve the issues in this case. For instance, many of the arguments advanced by TRG and WRH have failed for the simple reason that the Agreement, as properly interpreted, allows for shared responsibility for development duties among developers, according to their proportionate interests in the subdivision. We do not opine on how that responsibility is or should be allocated. For instance, we are not suggesting that TRG or WRH would have responsibility for public improvements associated with lots that

they did not acquire. The procedural posture of this case requires no such determination. The City and Fidelity alleged in their complaints that the public improvements for the subdivision were incomplete. These were broad allegations but, as noted, TRG and WRH have not challenged their adequacy. WRH attempted instead to rebut those allegations with proof that the public improvements for the lots it purchased were already completed at the time of the purchase. The proof was inconclusive; the record does not permit us to determine which improvements were completed for which lots. More to the point, contesting a factual allegation is not a proper avenue for dismissal under section 2-615 or section 2-619. *Reynolds*, 2013 IL App (4th) 120139, ¶ 51. At this stage of the proceeding, we determine only that the City and Fidelity have properly alleged that both TRG and WRH were responsible for completing the public improvements for the subdivision and that those improvements were not completed. We cannot say as a matter of law that TRG and WRH did not breach the Annexation Agreement.

¶ 130                           2. Covenants Running with the Land

¶ 131    The City and Fidelity also alleged in their complaints that the Annexation Agreement's requirements are covenants running with the land.

¶ 132    Where a covenant runs with the land, the benefit or obligation of the covenant will pass with ownership. *La Salle National Trust, N.A. v. Village of Westmont*, 264 Ill. App. 3d 43, 71 (1994). In order for a covenant to run with the land, three criteria must be met: "(1) The grantor and grantee must have intended the covenant to run with the land; (2) the covenant must touch and concern the land; (3) there must be privity of estate between the party claiming the benefit of the covenant and the party resting under the burden of the covenant." *Streams Sports Club, Ltd. v. Richmond*, 99 Ill. 2d 182, 188 (1983). As they did below, the City and Fidelity present this

common-law test as an alternative basis, besides the succession clause in section 22.B of the Annexation Agreement, for holding that TRG and WRH became bound by the Agreement.

¶ 133   TRG offers no argument at all on whether the Annexation Agreement's requirements run with the land.  WRH, for its part, does not dispute that the three criteria were met.  Instead, WRH submits that whether the requirements run with the land is governed by the terms of the Annexation Agreement and the Lot Purchase Agreement.  WRH asserts (as we have discussed) that "[n]o developer obligations were transferred under either" agreement.  We need not decide whether WRH has the correct view of the law, because, for the reasons provided above, we reject its interpretation of the Annexation Agreement and the Lot Purchase Agreement as to whether developer obligations were transferred to WRH.

¶ 134                              3. Conclusion

¶ 135   For the foregoing reasons, we hold that the City and Fidelity properly alleged that TRG and WRH became successor owners/developers under the Annexation Agreement and that they breached the Agreement by failing to finish the public improvements in the subdivision. Therefore, the trial court erred in dismissing the City's counts against TRG and WRH.  In the next section, we examine whether Fidelity adequately alleged that it was entitled, under surety principles, to recover from WRH for its breach of the Agreement.

¶ 136          B. Whether a Surety Relationship Arose Between Fidelity and WRH

¶ 137   Fidelity appeals the dismissal of counts I and IV of its complaint against WRH in No. 11-L-30.  The counts sought reimbursement from WRH in the event that Fidelity paid a judgment to the City for breach of the Annexation Agreement.  The counts rested on these three main allegations:  (1) Fidelity was a surety to KH for completion of the public improvements required by the Agreement for units 1 and 2 of the subdivision; (2) WRH became a successor developer

under the Agreement by purchasing lots in units 1 and 2; and (3) by virtue of that succession, a surety relationship between Fidelity and WRH arose by operation of law, making WRH the principal obligor and Fidelity the secondary obligor with respect to the development duties under the Agreement. Only points (2) and (3) are disputed on appeal. We have held that Fidelity properly alleged point (2). For the reasons provided below, we hold that Fidelity also properly alleged point (3).

¶ 138 Our discussion draws heavily from our analysis in *City of Elgin*. There, we explained as follows the nature of a surety relationship:

"A surety relationship arises when one agrees to assume liability for the payment of another's debt or the performance of another's obligations under a contract. See Black's Law Dictionary 1456 (7th ed. 1999); Restatement (Third) of Suretyship and Guaranty § 1 (1996); see also *Mercantile Holdings, Inc. v. Keeshin*, 187 Ill. App. 3d 1088, 1094 (1989) (surety relationship may arise by operation of law). A surety is a secondary obligor whose liability is collateral to that of the principal obligor. *Chandler v. Maxwell Manor Nursing Home, Inc.*, 281 Ill. App. 3d 309, 323 (1996) ('The surety's obligation, wherein he agrees to be answerable for the debt or obligation of another, is not an original and direct obligation for the performance of his own act, but rather is an accessorial obligation to the obligation contracted by the principal.[').]  'As a general rule, the liability of a surety is measured by the liability of its principal.' *Village of Rosemont v. Lentin Lumber Co.*, 144 Ill. App. 3d 651, 668 (1986). Because the surety is bound to perform if the principal obligor does not, the surety has the right to compel the principal obligor to either perform its obligation or pay the costs that accrue to the surety because of the principal obligor's nonperformance. *Estate of Ramsay v. Whitbeck*, 183 Ill. 550,

567 (1900) ('When a surety signs a bond the law raises an implied promise by the principal to reimburse the surety for any loss which he may sustain ***.'); Restatement (Third) of Suretyship and Guaranty § 21 (1996). Thus, although both the surety and the principal obligor may be liable to the 'obligee' (the party to whom the principal obligor owes the obligation to perform), 'as between the principal obligor and the secondary obligor, it is the principal obligor who ought to perform the underlying obligation or bear the cost of performance.' *Id.* § 1(1)(c)." *City of Elgin*, 2015 IL App (2d) 150013, ¶ 19.

¶ 139 As noted, the agreement in *City of Elgin* required developer KH to complete the public improvements in the subdivision. Fidelity issued performance bonds to KH to secure its completion of the public improvements. Under this legal arrangement, Elgin was the obligee, KH was the principal obligor, and Fidelity, as the surety, was the secondary obligor. As the surety, Fidelity could compel KH's performance under the agreement or could demand reimbursement for fulfilling those duties itself. *Id.* The issue in *City of Elgin* was whether Fidelity adequately alleged that TRG, when it acquired KH's interests in the subdivision, became, by operation of law, the principal obligor under the surety bonds and thus subject to Fidelity's demand for performance or reimbursement.

¶ 140 We held that Fidelity adequately alleged that TRG became the successor principal obligor. We determined that, "because TRG assumed [KH's] obligations under the [agreement] and those obligations were the basis for the surety bonds, a suretyship relation arose as a matter of law, and TRG owes Fidelity a common-law duty to perform its obligations and to hold Fidelity harmless from its failure to do so." *Id.* ¶ 27. We held that this relationship arose despite the facts that (1) TRG was not a signatory to the performance bonds, (2) the bonds did not mention the agreement, and (3) Fidelity was not a party to the agreement. First, as to point (1),

we held that "TRG is not a stranger to the bonds upon which [Elgin] sued Fidelity" but that rather "TRG's underlying obligation to [Elgin] (which arose when TRG bought the remaining property in the development) is itself the subject matter of those bonds." *Id.* Case law, we noted, demonstrates that a surety relationship can arise by operation of law even where "the successor principal is not in direct contractual privity with the surety[.]" *Id.* ¶ 22.

¶ 141 Second, as to points (2) and (3), we held that there was "no doubt that the obligations secured by the bonds arose out of the [agreement], even if that agreement was not specifically mentioned in the bonds." *Id.* ¶ 24.

¶ 142 In *Village of Montgomery*, 2016 IL App (2d) 150571-U, ¶ 27, we applied our holding in *City of Elgin* to "identical circumstances." As noted, *Village of Montgomery* was another case in which Fidelity issued a performance bond to secure KH's development duties under an annexation agreement. We held that, when TRG succeeded to KH's interests as developer, and thus to KH's duties under the agreement, TRG also succeeded, by operation of law, to KH's status as principal obligor in the surety relationship. *Id.* ¶ 24. Fidelity could therefore seek redress from TRG for its failure to perform under the agreement. See *id.*

¶ 143 The present case is no more distinguishable from *City of Elgin* than was *Village of Montgomery*. The City and Fidelity alleged that the February 2005 performance bonds were issued for the purpose of securing KH's performance as developer under the Annexation Agreement. The record supports that allegation. The Agreement required KH to acquire bonds to secure its completion of the public improvements for the subdivision. The bonds did not mention the Agreement but did describe the improvements that KH agreed to complete in units 1 and 2 of the subdivision. Under our reasoning in *City of Elgin*, it is of no consequence that WRH was not a signatory to the bonds or that Fidelity was not a signatory to the Agreement. Thus, we

hold that the complaints adequately alleged that, when WRH acquired KH's interests in the subdivision, a surety relationship arose by operation of law, making WRH the principal obligor and, hence, liable to Fidelity.

¶ 144  WRH, contending that it did not succeed KH as the principal obligor, restates many of the arguments it made as to whether it became a successor developer under the Annexation Agreement.  We addressed those arguments above and are concerned here only with WRH's arguments specific to the further question of whether WRH, *in becoming a successor developer*, also became the principal obligor and, thus, was liable to Fidelity for failing to perform under the Agreement.

¶ 145  First, WRH argues that Fidelity lacks standing to enforce the Annexation Agreement, because it was not a party to the Agreement.  WRH notes that the Agreement states that it is enforceable by "parties, or their successors or assigns."  WRH also cites section 11-15.1-4 of the Municipal Code, which states that an annexation agreement is enforceable by "[a]ny party to such agreement."  65 ILCS 5/11-15.1-4 (West 2002).  TRG argued in *City of Elgin* that Fidelity had no standing because it was not a party to the agreement, and we rejected that argument.  *City of Elgin*, 2015 IL 150013, ¶¶ 23-24.  We cannot discern whether TRG, like WRH here, cited a specific provision (statutory or contractual) on enforcement.  In any case, WRH's argument has no merit.  Fidelity is not directly enforcing the Agreement, as a party to it.  Rather, the Agreement is the underlying obligation for which Fidelity agreed to be the surety.  Fidelity is invoking its common-law right to seek relief against the principal obligor—by succession—of the duties required by the Agreement.  See *Chandler v. Maxwell Manor Nursing Home, Inc.*, 281 Ill. App. 3d 309, 323 (1996) ("The surety's obligation, wherein he agrees to be answerable for the debt or obligation of another, is not an original and direct obligation for the performance of

his own act, but rather is an accessorial obligation to the obligation contracted by the principal."). " '[W]hen a surety signs a bond, the law raises an implied promise by the principal to reimburse the surety for any loss which he may sustain.' " *City of Elgin*, 2015 IL App (2d) 150013, ¶ 27 (quoting *Estate of Ramsay v. Whitbeck*, 183 Ill. 550, 567 (1900)). Thus, Fidelity is more properly viewed as enforcing the surety bond. Incidentally, we are unsure if WRH realizes that its logic, as extended, would have barred Fidelity from seeking relief even against KH. Such a result would fairly eviscerate the law of surety.

¶ 146 Next, WRH argues that Fidelity failed to properly plead implied or express indemnity as a basis for its claim for relief from WRH. We disagree. "Indemnity is a common law doctrine which shifts the entire responsibility from the party who has been compelled to pay the plaintiff's loss to another who actually was at fault." *Kerschner v. Weiss & Co.*, 282 Ill. App. 3d 497, 502 (1996). "The right to indemnity may be express, as in a contractual provision, or may be implied in law, arising in situations in which a promise to indemnify can be implied from the relationship between the parties." *Id.*

¶ 147 The surety bonds represent Fidelity's express assumption of liability for completing the public improvements. However, implied in the surety arrangement is a promise by the principal obligor, KH (and its successors), to reimburse Fidelity for its losses. *City of Elgin*, 2015 IL App (2d) 150013, ¶ 19 (citing *Estate of Ramsay*, 183 Ill. at 567). Fidelity properly pled this implied promise as a basis for relief. WRH's citation of other bases in the law for an implied right to indemnity (see, *e.g.*, *Kerschner*, 282 Ill. App. 3d at 503-04) does not detract from the well-established law of surety.

¶ 148 Next, WRH faults Fidelity for failing to cite any Illinois case holding that a surety relationship can arise by operation of law. WRH states:

> "*Fidelity did not cite to a single case that allowed for a claim to be asserted by a surety against a stranger to the bond transaction (e.g., WRH) without some express agreement by the stranger to take on the bond principal's responsibility.* WRH and [KH] did not bargain for WRH to take on any of the public improvement responsibility, and the agreements attached to the pleadings show this fact. Legal responsibility to perform under a contract cannot just magically appear out of thin air. There must be a statutory or contractual basis for such a claim to be successful. As Fidelity has neither, the Trial Court properly dismissed the claims against WRH.
>
> A suretyship implied at law requires both either an implied contract—an actual promise—between a primary and secondary obligor. No one happens into a suretyship arrangement without acquiescing to it. Here, Fidelity and WRH had, and have, no such relationship. Fidelity's promise was to pay the debt of [KH], not that of WRH, and therefore, Fidelity's reimbursement and indemnity claims were properly dismissed." (Emphasis added.)

¶ 149 The accusation that Fidelity cites no pertinent authority is curious, as Fidelity cites *City of Elgin*, which expressly holds that a surety relationship can indeed arise by operation of law. WRH proceeds, in this quoted passage, to make a series of emphatic claims about surety law, and WRH makes other such claims in the remainder of its argument. Many of them conflict with our reasoning in *City of Elgin*, yet at no point in WRH's disquisition on surety law does it even acknowledge what we said in that decision. Therefore, we decline to regard these statements as criticisms of *City of Elgin* and potential grounds for departing from it. As noted, the facts in this case are indistinguishable from *City of Elgin* on the issue of whether WRH became, by operation

of law, the principal obligor in the surety relationship created by the February 2005 performance bonds.

¶ 150    We hold that the trial court erred in dismissing counts I and IV of Fidelity's third-party complaint against WRH.

¶ 151                              III. CONCLUSION

¶ 152    For the foregoing reasons, we reverse the orders of the circuit court of Kendall County (1) in No. 11-L-30, dismissing counts V and VI of the City's amended complaint and counts I and IV of Fidelity's amended third-party complaint, and (2) in No. 14-MR-90, dismissing counts V through VII of the City's amended complaint.  The cause is remanded for further proceedings consistent with this opinion.

¶ 153    Reversed and remanded.