2022 IL App (2d) 200780
Nos. 2-20-0780 & 2-21-0301 cons.
Opinion filed April 21, 2022

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| THE VILLAGE OF KIRKLAND, | ) | Appeal from the Circuit Court |
| | ) | of De Kalb County. |
| Plaintiff-Appellant, | ) | |
| | ) | |
| v. | ) | No. 19-L-33 |
| | ) | |
| KIRKLAND PROPERTIES HOLDINGS | ) | |
| COMPANY, LLC I, and KIRKLAND | ) | |
| PROPERTIES HOLDINGS COMPANY, | ) | |
| LLC II, | ) | Honorable |
| | ) | Bradley J. Waller, |
| Defendants-Appellees. | ) | Judge, Presiding. |

JUSTICE BRENNAN delivered the judgment of the court, with opinion.
Justices McLaren and Hudson concurred in the judgment and opinion.

**OPINION**

¶ 1    On August 27, 2020, plaintiff, the Village of Kirkland (Village), filed its third amended complaint against defendants, Kirkland Properties Holdings Company, LLC I, and Kirkland Properties Holdings Company, LLC II (hereinafter KPHC I, KPHC II, and collectively KPHC). In the complaint, the Village alleged that KPHC breached a 2003 recorded annexation agreement (Annexation Agreement) that the Village entered into with the National Bank and Trust of Sycamore as trustee of trust No. 4235000 (landowner), the original owner of the subject property, a 114-acre subdivision. The Village alleged that KPHC became bound by the terms of the Annexation Agreement as a successor owner of record to the landowner when KPHC bought *a*

*portion* of the subject property from an entity, Plank Road, LLC (Plank) (not a party to this appeal), which had, in turn, acquired the property from the landowner. Specifically, the complaint alleged that KPHC breached the Annexation Agreement by refusing the Village's request for a letter of credit in the amount proportionate to the number of lots KPHC owned in the subdivision, to secure the completion of roads in the subdivision as it was developed. The Village sought damages for breach of contract or, in the alternative, injunctive relief in the form of specific performance. KPHC moved to dismiss pursuant to section 2-615 of the Code of Civil Procedure (735 ILCS 5/2-615 (West 2020)), arguing at the hearing on the motion that, although the Annexation Agreement was a covenant that ran with the land, the Annexation Agreement would not confer successor status to an entity that purchased only a portion of the subject property as opposed to the whole of the subject property. The trial court, relying primarily on *Doyle v. Village of Tinley Park*, 2018 IL App (1st) 170357, and briefly referencing *United City of Yorkville v. Fidelity & Deposit Co. of Maryland*, 2019 IL App (2d) 180230, agreed with KPHC and dismissed the case with prejudice. The Village timely appeals (No. 2-20-0780), arguing that *Doyle*, a First District case, is distinguishable and that *Yorkville*, a Second District case, actually supports its position.

¶ 2    Having secured the dismissal of the complaint against it, KPHC moved for attorney fees pursuant to the terms of the Annexation Agreement. The trial court determined that the Annexation Agreement entitled KPHC, as the prevailing party in a lawsuit brought pursuant to the Annexation Agreement, to fees. The Village appeals (No. 2-21-0301), arguing, *inter alia*, that the court's earlier ruling that KPHC was not bound by the terms of the Annexation Agreement precluded it from awarding attorney fees under the Annexation Agreement. The two appeals, Nos. 2-20-0780 and 2-21-0301, have been consolidated for the purposes of argument and disposition (but not briefing). For the reasons that follow, we reverse the trial court's ruling that KPHC was not bound

by the terms of the Annexation Agreement. As a result, KPHC is no longer the prevailing party and we vacate the award of attorney fees.

¶ 3                                    I. BACKGROUND

¶ 4      The following background information is taken largely from the allegations of fact set forth in the third amended complaint, which must be taken as true at this stage in the proceedings. See *Cochran v. Securitas Security Services USA, Inc.*, 2017 IL 121200, ¶ 11.

¶ 5                              A. The Annexation Agreement

¶ 6      On May 5, 2003, the Village entered into the Annexation Agreement with the sole, original owner of the subject property, the landowner, at that time, the Trust, the beneficiaries of which were David R. Rood, Barbara L. Rood, Robert D. Rood, and Ann M. Rood. As to its term and the question of successorship, the Annexation Agreement provided that it was for a term of 20 years and that it was "made pursuant to and in accordance with [sections 11-15.1-1 to 11-15.1-5] of the [Municipal] Code." Section 11-15.1-4 of the Municipal Code, in turn, provides: "Any annexation agreement executed pursuant to this Division 15.1 *** shall be binding upon the *successor owners of record of the land which is the subject of the agreement* and upon successor municipal authorities of the municipality and successor municipalities." (Emphasis added.) 65 ILCS 5/11-15.1-4 (West 2002). The Annexation Agreement, section 28, paragraph I, likewise provided that it was "[b]inding on Assigns. All terms and provisions of this Agreement shall be binding upon, inure to the benefit of, and be enforceable by the parties hereto, their heirs, executors, administrators, *successors*[,] and assigns." (Emphasis added.)

¶ 7      The Annexation Agreement described the subject property as consisting of 114.27 acres located immediately north of Illinois Route 72 and presently contiguous with the corporate limit of the Village. It provided in its introductory terms that the subject property was to be developed

and specifically that (1) the landowner desired to annex the subject property to the Village "to develop thereon a residential subdivision substantially in accordance with a preliminary subdivision plat *** which is attached hereto," and (2) the parties desired to develop the subject property "as conveniently as may be and subject to the terms and conditions hereinafter contained."

¶ 8 The Annexation Agreement placed obligations on the Village, including but not limited to the following. The Village was to annex the subject property to the Village. It was to rezone the subject property for single-family residential homes and approve and record two plats for subdivision. It was to provide water mains, access to Village treatment plant services, and potable water for the subdivision.

¶ 9 The Annexation Agreement also placed obligations on the landowner, including but not limited to those set forth in sections 10 and 14. Section 10 provided that the landowner was to construct all roadways required to be developed on the subject property. With certain exceptions, the roadways were to be constructed in accordance with the Village's standards. Once 50% of the buildings in a particular phase were occupied, no further occupancy permits would be issued unless the road was complete to a certain stage of development. Once 80% of the buildings in a particular phase were occupied, no further occupancy permits would be issued unless the road was complete to a certain, later stage of development. Upon the completion of the road, the Village would accept the improvements and thereafter maintain the road.

¶ 10 Section 14 provided that the landowner would secure an irrevocable letter of credit from a financial institution payable to the Village to guarantee the quality construction of all public facilities to be constructed at any unit or stage of development for which approval is sought. The letter of credit would be in the amount of 100% of the contract costs of construction in the unit or

stage of development or 125% of the landowner engineer's contract estimate in the unit or stage of development.

¶ 11 Other sections of the Annexation Agreement, including those addressing stages and phases of development (section 5) and the dedication of improvements (section 13), will be discussed later in conjunction with our interpretation of the agreement.

¶ 12 B. The Transfer of Portions of the Subject Property

¶ 13 On November 30, 2011, the landowner sold a portion of the subject property to Plank, as is documented in exhibit I attached to the Village's complaint. At that time (and at all times relevant to this appeal), the subject property had been divided into 82 lots across two phases of development. Plank purchased 41 lots, some of which were located in phase one and some of which were located in phase two.

¶ 14 On January 25, 2017, Plank sold 34 lots to KPHC. As a result, KPHC I owned 15 of 56 lots in phase one, and KPHC II owned 19 of 26 lots in phase two. The third amended complaint alleged that "the contract by which [KPHC] acquired *** the lots provides that title to the lots was subject to all 'agreements with any municipality regarding the development of the Property.' "

¶ 15 C. The Village Seeks KPHC's Performance

¶ 16 Meanwhile, as KPHC does not dispute, the Village continued to perform under the Annexation Agreement in that it annexed the subject property to the Village, rezoned the subject property to allow for single-family residences, and approved two final plats for subdivision. It also provided lots within the subdivision with access to Village treatment plant services, water mains, and potable water.

¶ 17 On May 8, 2019, the Village sent KPHC letters of demand based on sections 10 and 14 of the Annexation Agreement. It requested that KPHC deposit a letter of credit for an amount

*proportionate* to the number of lots it owned in the development and/or the road frontage of such lots in order to secure the completion of the roads in the development. The Village calculated that, based on the total contract estimate for the completion of the roads in the entire development and KPHC's share of ownership, KPHC's letter of credit was to be for $357,295. KPHC did not supply the letter of credit, and the Village filed suit. Following a series of amended pleadings, KPHC moved to dismiss the Village's third amended complaint, the operative complaint in this case, pursuant to section 2-615 of the Code of Civil Procedure.

¶ 18                            D. The Trial Court's Ruling

¶ 19    On December 4, 2020, the trial court conducted a hearing on KPHC's motion to dismiss. Primarily, the parties debated whether KPHC was a successor owner of record to the subject property such that it was bound by the terms of the Annexation Agreement. KPHC acknowledged that the Annexation Agreement concerned a covenant that ran with the land. The question for the court, it continued, was *what* land. In KPHC's view, the covenant ran with the land in its entirety, only. Once the land was sold in any configuration less than its entirety, the covenant ceased to apply. KPHC argued that its position was supported by *Doyle*, which it asserted stood for the proposition that, where the original parties to an annexation agreement intend for the covenant to run with the land, even when subdivided and portioned off to different developers, the annexation agreement must so expressly provide.

¶ 20    The Village responded that the Annexation Agreement concerned a covenant that ran with the land whether in its entirety or subdivided and portioned off to different developers. The Village argued that the Annexation Agreement was premised upon and contemplated subdivision of the land. The Village referred, specifically, to those provisions concerning infrastructure and storm water requirements that would be "completely unnecessary" if the Annexation Agreement were to

apply only to a property owner who retained the whole acreage. It also argued that KPHC's interpretation of the Annexation Agreement led to an absurd result in that, under KPHC's interpretation, KPHC would have no standing to sue the Village to compel it to fulfil its obligation to provide water service, for example, merely because the property had been subdivided. If, in a hypothetical scenario, KPHC owned 99 of 100 lots, KPHC still would not have standing. Finally, the Village argued that *Doyle* was factually distinguishable, factually unique, and had limited precedential value.

¶ 21 In rebuttal, KPHC acknowledged that, under its interpretation, it had no standing to compel the Village to fulfil its obligations under the Annexation Agreement: "[T]rust me, that's a problem in this case, because we have a neighborhood that is not developed, despite [the Village] once having an adequate security bond. So this ruling will cut both ways." KPHC also asserted that the Second District embraced the *Doyle* decision in *Yorkville*.

¶ 22 The trial court granted KPHC's motion to dismiss. It explained that section 11-15.1-1 of the Municipal Code provides that an annexation agreement is a contract between a municipality and an owner of land. Section 11-15.1-4 further provides that the annexation agreement will be binding on successor owners of the land that is the subject of the agreement. In this case, the subject property "consists of 114.27 acres located north of [Route 72]. That is for all intents and purposes the entire subdivision." It concluded:

"The agreement, like [section 11-15.1-4], is silent on the purchase *** of less than all of the *** subject property.

*Doyle* states that if the drafters [of an annexation] agreement intended to confer successor status upon each and every purchaser of a lot within a subdivision as opposed to a developer who purchased the entire subdivision, the agreement would have expressly

stated successor owners of record of the subject property *** *and/or any portion thereof.*

It didn't in *Doyle* and it doesn't here." (Emphasis added.)

The court also referenced *Yorkville*, finding it distinguishable in that the annexation agreement in that case contained a provision that acknowledged that a successor developer could own a portion of the subject property. The court also stated that the Village had failed to plead the existence of any other form of privity between itself and KPHC, such as contractual assignment. In the court's view, that the deed between Plank and KPHC stated that KPHC took title subject to the terms of any municipal agreement merely raised the question of how the terms of the Annexation Agreement should be interpreted. As such, the court determined that the Village had failed to state a cause of action and granted KPHC's section 2-615 motion to dismiss.

¶ 23    The trial court's written order provided: "For the reasons stated on the record, defendant's motion to dismiss is granted." The court awarded KPHC attorney fees pursuant to a fee-shifting provision in the Annexation Agreement. This properly noticed appeal followed.

¶ 24                                II. ANALYSIS

¶ 25    On appeal, the Village challenges the trial court's section 2-615 dismissal of its third amended complaint for breach of contract (seeking damages) and injunctive relief (seeking specific performance). To properly plead the first of these actions, breach of contract, a plaintiff must allege facts supporting the following elements: (1) the existence of an operative contract, (2) a breach of the contract, (3) plaintiff's performance of its duties under the contract, and (4) damages. *Village of Orland Park v. First Federal Savings & Loan Ass'n of Chicago*, 135 Ill. App. 3d 520, 529 (1985). As to the second action, section 11-15.1-4 of the Municipal Code provides that any party to an annexation agreement "may by civil action, mandamus, injunction[,] or other proceeding, enforce and compel performance of the agreement." 65 ILCS 5/11-15.1-4

(West 2020). The question presented by each of these claims is whether KPHC was bound by the terms of the Annexation Agreement, as a successor owner of record of land subject to the agreement, such that it can be found to have breached the agreement by failing to provide a letter of credit and such that it can be compelled to provide the letter of credit. The Village argues that KPHC is bound by the terms of the Annexation Agreement because the Annexation Agreement is a covenant that runs with the land and section 11-15.1-4 of the Municipal Code as well as the Annexation Agreement itself provide that it is binding on *successors* of the land that is the subject of the agreement. The Village contends that the trial court erred in determining that KPHC was not bound by the terms of the Annexation Agreement as a successor owner of record because KPHC owned only a portion of the land that was the subject of the Annexation Agreement. It also challenges the trial court's decision to award KPHC attorney fees. For the reasons that follow, we agree that KPHC was a successor owner of record of the subject property even though it owned only a portion of the subject property. Because KPHC is no longer the prevailing party, it is not entitled to attorney fees.

¶ 26    Preliminarily, we address KPHC's argument that the Village cannot state a claim for injunctive relief in the form of specific performance by securing a letter of credit, because the Village has an adequate remedy at law precluding equitable relief—damages under its breach of contract claim. Specific performance is a form of injunctive relief. *New Park Forest Associates II v. Rogers Enterprises, Inc.*, 195 Ill. App. 3d 757, 761 (1990). To be sure, ordinarily, injunctive relief is not appropriate when there is an adequate remedy at law, here, damages. *Id.* However, when, as here, a party grounds its request for specific performance in section 11-15.1-4, which specifically provides for injunctive relief, the action remains viable despite the availability of other possible avenues of relief. See *Orland Park*, 135 Ill. App. 3d at 528-29.

¶ 27 A section 2-615 motion to dismiss challenges the legal sufficiency of the complaint and asserts that the plaintiff has failed to state a cause of action. 735 ILCS 5/2-615 (West 2020). When ruling on a section 2-615 motion to dismiss, the trial court must accept as true all well-pled facts, as well as any reasonable inferences that may arise from them. *Cochran*, 2017 IL 121200, ¶ 11. We review section 2-615 dismissals *de novo*. *Id.* Here, the trial court's dismissal was guided by its interpretation of section 11-15.1-4 of the Municipal Code and the Annexation Agreement, issues that are also subject to *de novo* review. *Valerio v. Moore Landscapes, LLC*, 2021 IL 126139, ¶ 20.

¶ 28 When construing a statute or contract, the primary goal is to give effect to the intent of the parties who drafted the document. *Yorkville*, 2019 IL App (2d) 180230, ¶ 74. The best indicator of intent is the language of the document, given its plain and ordinary meaning. *Id.* The court will not read into the document a provision it does not contain. See *Carrillo v. Jam Productions, Ltd.*, 173 Ill. App. 3d 693, 698 (1988). The document is to be read as a whole (*Gallagher v. Lenart*, 226 Ill. 2d 208, 233 (2007)) and should be reasonably interpreted to avoid absurd results (*Foxfield Realty, Inc. v. Kubala*, 287 Ill. App. 3d 519, 524 (1997)).

¶ 29 As we look to the text of the statute and the Annexation Agreement, we are mindful that public policy favors the enforcement of annexation agreements. *Orland Park*, 135 Ill. App. 3d at 526. Annexation agreements are critical to the successful implementation of municipal improvements. See *id.* As the *Orland Park* court explained:

"The authorization of preannexation agreements by statute, such as section 11-15.1-1, serves to further important governmental purposes, such as the encouragement of expanding urban areas and to do so uniformly, economically, efficiently and fairly, with optimum provisions made for the establishment of land use controls and necessary municipal improvements including streets, water, sewer systems, schools, parks, and

similar installations. This approach also discourages fragmentation and proliferation of special districts. Additional positive effects of such agreements include controls over health, sanitation, fire prevention and police protection, which are vital to governing communities." *Id.*

One of the ways the legislature has ensured that annexation agreements will be enforced is by empowering and holding accountable successor owners to the terms of the annexation agreement. *Id.*

¶ 30    As mentioned, section 11-15.1-4 of the Municipal Code addresses successor status and provides:

> "Any annexation agreement executed pursuant to this Division 15.1 *** *shall be binding upon the successor owners of record of the land which is the subject of the agreement* and upon successor municipal authorities of the municipality and successor municipalities. Any party to such agreement may by civil action, mandamus, injunction or other proceeding, enforce and compel performance of the agreement." 65 ILCS 5/11-15.1-4 (West 2002).

¶ 31    Also as mentioned, section 28 of the Annexation Agreement provides that it is binding on successors: "Binding on Assigns. All terms and provisions of this Agreement shall be binding upon, inure to the benefit of, and be enforceable by the parties hereto, their heirs, executors, administrators, *successors*[,] and assigns." (Emphasis added.)

¶ 32    Turning to the parties' specific arguments, we first consider whether the Annexation Agreement is a covenant that runs with the land. When a covenant runs with the land, the benefit or obligation of the covenant will pass with ownership. *La Salle National Trust, N.A. v. Village of Westmont*, 264 Ill. App. 3d 43, 71 (1994). An annexation agreement is a covenant that runs with

the land if three requirements are met: (1) the grantor and grantee intended it to run with the land, (2) it touches and concerns the land, and (3) there is privity of estate between the party claiming the benefit of the covenants and the party resting under the burden of the covenant. *Streams Sports Club, Ltd. v. Richmond*, 99 Ill. 2d 182, 188 (1983).

¶ 33 Here, as to the first requirement, language commonly used to demonstrate intent to create a servitude includes statements that the interests created "run with the land" or that they "bind" to the benefit of "heirs," "assigns," or "successors" of the drafting parties. Restatement (Third) of Property § 2.2 cmt. d (2000). Section 28 of the Annexation Agreement stated that it was "binding upon *** [the] heirs, executors, administrators, successors[,] and assigns," and the parties to the agreement recorded it. This demonstrates that the parties intended the Annexation Agreement to run with the land.

¶ 34 As to the second requirement, a covenant touches and concerns the land if it "affects the use, value and enjoyment *** of the property." (Internal quotation marks omitted.) *In re Application of the County Treasurer & ex officio County Collector*, 373 Ill. App. 3d 679, 690 (2007). Here, the very purpose of the Annexation Agreement is to annex the property to the Village so that it can be developed. The agreement addresses, *inter alia*, the annexation and platting of the subject property, stormwater drains on the subject property, wastewater treatment on the subject property, well and water supply and distribution on the subject property, and construction of roadways on the subject property. This demonstrates that the Annexation Agreement affects the use, value, and enjoyment of the subject property.

¶ 35 As to the third requirement, privity is defined as "[t]he connection or relationship between two parties, each having a legally recognized interest in the same subject matter (such as a transaction, proceeding, or piece of property)." Black's Law Dictionary (11th ed. 2019). Privity of

estate, in particular, is defined as "[a] mutual or successive relationship to the same right in property." *Id.* The Annexation Agreement clearly provides that it is binding on successors, and thus, the Village and a successor owner each have a legally recognized interest in the same subject matter—the development of the subject property.

¶ 36　　Though KPHC at oral argument half-heartedly argued that the Annexation Agreement did not run with the land, this is contrary to the position it took at the December 4, 2020, hearing below, where it conceded that the Annexation Agreement was a covenant that ran with the land. Consistent with our foregoing analysis, not to mention the prohibition against taking a contrary position on appeal (*Sakellariadis v. Campbell*, 391 Ill. App. 3d 795, 800 (2009)), we hold KPHC to its position that the Annexation Agreement runs with the land. But as KPHC notes, this raises the question "what land?"

¶ 37　　Section 11-15.1-4 of the Code, which provides that an annexation agreement "shall be binding upon the successor owners of record *of the land which is the subject of the agreement*" (emphasis added) (65 ILCS 5/11-15.1-4 (West 2002)), neither expressly provides for nor expressly precludes the application of the terms of the annexation agreement when a subsequent owner owns just a *portion* of the land that is the subject of the agreement, as opposed to all the land that was subject to the agreement. Similarly, the Annexation Agreement, which provides that it is governed by the Municipal Code and is binding on "the parties hereto, [and] their *** successors," neither expressly provides for nor expressly precludes the application of its terms to subsequent owners of a portion of the property originally subject to the Annexation Agreement. KPHC, citing *Doyle*, argues that, unless the Annexation Agreement expressly provides that the agreement is binding on successor owners of the subject property *or any portion thereof*, then it is binding only on successor owners of the subject property in its entirety. The Village, citing *Yorkville*, argues that there are no

magic words and that, when read in its entirety, it is clear that the drafters of the Annexation Agreement contemplated that the subject property would be subdivided and developed in phases, potentially by more than one developer. As such, the Village urges, the Annexation Agreement continues to apply to a subsequent owner who owns just a portion of the subject property. Our review of *Doyle* and *Yorkville*, as well as another Second District case, *City of Elgin v. Arch Insurance Co.*, 2015 IL App (2d) 150013, leads us to conclude that the Village is correct. We summarize the relevant portions of *Doyle*, *Yorkville*, and *Elgin* below.

¶ 38                                    A. *Doyle*, *Yorkville*, and *Elgin*

¶ 39     *Doyle* addressed whether the purchasers of a single residential home built on a lot encompassed by a 1990 annexation agreement could sue the developer, pursuant to the annexation agreement, for the improper design and construction of a sewer system. *Doyle*, 2018 IL App (1st) 170357, ¶ 1. The agreement defined the subject property as an 828-acre parcel of land contiguous with the village. *Id.* ¶ 4. The agreement obligated the developer to design and construct a sewer system. *Id.* In 2004, the developer and the homeowners entered into a contract to build one residential home on a single lot within the subdivision. *Id.* ¶ 5. The contract contained a limited warranty requiring the developer to fix any defects due to faulty construction within one year from the date of closing. *Id.* In 2007, the homeowners began noticing problems with the sump pump and the sewer system. *Id.* ¶ 6. Between 2009 and 2011, the homeowners worked with the village to repair the sewer system as it affected their home, but the home was structurally damaged in the interim. *Id.* ¶¶ 7-16.

¶ 40     The homeowners filed suit against the developer, alleging that it had breached its duty under the annexation agreement to install a working sewer system. *Id.* ¶ 17. The homeowners asserted standing to sue under the annexation agreement as successors to the agreement to the

extent that they were successor owners of record under the agreement's successor liability clause. *Id.* The agreement's successor liability clause provided: " 'This Agreement shall be binding upon and inure to the benefit of the parties hereto, successor owners of record of the Subject Property, assignees, lessees and upon any successor municipal authorities of said Village and successor municipalities ***.' " *Id.*

¶ 41 The trial court dismissed the homeowners' claim against the developer, determining that they did not have standing to sue the developer for breach of the annexation agreement. *Id.* ¶ 20. In doing so, it concluded that, "although the annexation agreement provided for successor liability, the [homeowners] were successors to [the developer] and not the village, so they could not sue [the developer] for its alleged breach of the agreement." *Id.*

¶ 42 The appellate court affirmed the trial court's dismissal, but on a different theory. The appellate court explained that neither the language of the statute nor the language of the annexation agreement supported the homeowners' position that they were "successor owners of record." *Id.* ¶¶ 30-31. Addressing the language of the statute, the court noted that the statute refers to " 'successor owners of record of the land which is the subject of the agreement' (65 ILCS 5/11-15.1-4 (West 2012)) but makes no reference to those who purchase only a small portion of that land." *Id.* ¶ 31. The court then explained: "[The homeowners] do not cite to any cases where homeowners who purchase a single lot from a larger annexed territory are considered 'successor owners of record' under the statute, nor does our research disclose any." *Id.*

¶ 43 Addressing the language of the agreement, the appellate court explained:

"The agreement define[d] the 'Subject Property' as an 828-acre parcel of land contiguous with the village—*i.e.*, the entire subdivision. If the drafters of the agreement intended to confer successor status upon each and every purchaser of a lot within the subdivision (as

opposed to, say, a developer who purchased the entire subdivision property from [the developer]), the agreement would have said 'successor owners of record of the Subject Property *or any portion thereof*.' " (Emphasis in original.) *Id.* ¶ 30.

¶ 44    In support of its position, the appellate court reasoned that the homeowners' interpretation of the statute and the annexation agreement would lead to an absurd result. *Id.* ¶ 32. Under the homeowners' interpretation, each and every homeowner in the subdivision would stand in the developer's shoes and be bound by the developer's obligations. *Id.* As a result, the village could sue any homeowner for failing to design and construct storm sewers in accordance with the agreement. *Id.*

¶ 45    As an aside, the appellate court noted that the homeowners' argument was logically flawed along the lines of the trial court's finding. See *id.* ¶ 32 n.3. That is, even if the homeowners were successor owners of record, they would succeed to the developer's interest in the annexation agreement, not the village's, and, therefore, they could not sue the developer for breach of the annexation agreement because they would in effect be suing themselves. *Id.*

¶ 46    Our decision in *Yorkville* involved an annexation agreement between the city on one side and the owners and the original developer on the other. *Yorkville*, 2019 IL App (2d) 180230, ¶ 1. The agreement defined the subject property as a 300-acre parcel of land contiguous with the city. *Id.* ¶ 6. The agreement required the original developer to complete public improvements in the subdivision. *Id.* ¶ 1. However, before the improvements were completed, the original developer went bankrupt. *Id.* Subsequently, two new developers purchased portions of the subject property. *Id.* However, they took the position that they were not bound by the annexation agreement to complete the improvements, because, *inter alia*, each new developer owned just a portion of the subject property. *Id.* The city sued the new developers. *Id.* The trial court dismissed the city's

complaint. *Id.* ¶¶ 43-44. In reversing the trial court's dismissal, this court began by addressing the terms of the annexation agreement. See *id.* ¶ 70.

¶ 47 The annexation agreement provided that it was entered into pursuant to the Municipal Code. *Id.* Its successor liability clause provided:

> " '22. GENERAL PROVISIONS
>
> ***
>
> B. *Successors and Assigns.* This Agreement shall inure to the benefit of and be binding upon the OWNERS, DEVELOPER and their successors in title and interest, and upon the CITY, and any successor municipalities of the CITY. It is understood and agreed that this Agreement shall run with the land and as such, shall be assignable to and binding upon each and every subsequent grantee and successor in interest of the OWNERS and DEVELOPER, and the CITY.' " *Id.* ¶ 72.

The annexation agreement clarified that a purchaser of lots for the purpose of *personal* residential occupation was not a successor bound by the terms of the annexation agreement. *Id.* ¶¶ 72, 85, 93. Further, the annexation agreement contained a provision outside the successor liability clause, section 9, which "refer[ed] to the rights and duties of 'DEVELOPER and all successor developers of the PROPERTY or any parcel or phase thereof." (Emphasis omitted.) *Id.* ¶ 90. (The full text of section 9 was not provided.)

¶ 48 The new developers argued that allowing the purchaser of less than the entire subject property to be bound by the terms of the annexation agreement would lead to an absurd result in that " 'a purchaser who buys even one empty lot in the subdivision would be responsible for performing *all of the public improvements for the subdivision as a whole*.' " (Emphasis in original.) *Id.* This court rejected the new developers' argument, explaining that nothing in the annexation

agreement required the responsibility for public improvements to fall entirely on one developer at a time. *Id.* We noted that the agreement did not place any restrictions on the severability of the subject property. *Id.* Specifically,

> "section 22.B [(*i.e.*, the successor liability clause)] places no restriction on the number of successor developers that may exist at any given time, each having succeeded to the duties of the original developer ***. Those duties would not fall entirely on any particular one of those successor developers but would be shared among them." *Id.*

This court further noted that section 9 of the agreement "refers to the rights and duties of 'DEVELOPER and all successor developers of the PROPERTY or any parcel or phase thereof." (Emphasis omitted.) *Id.* "Construed together, section 9 and section 22.B indicate that development duties can indeed fall on a developer that owns less than the entire 'PROPERTY,' in which case the liability will be proportionate to the amount of property that the developer owns." *Id.* ¶ 99.

¶ 49    As for *Doyle*, we disagreed with its analysis of section 11-15.1-4:

> "[In analyzing] section 11-15.1-4, we think that the court should have contrasted two types of parties who purchase from the original developer a portion of subdivided land that is the subject of an annexation agreement. The first is a party who, like the plaintiffs in *Doyle*, purchases a lot in order to construct, or have constructed, a residence for himself. The second is a party—namely a developer—who purchases lots in order to construct homes for third-party buyers. We agree with the *Doyle* court that it would be unfair to impose the obligations of an annexation agreement upon the first type of purchasers. However, it would be eminently fair to impose those obligations upon the second type— developers—even though, like the first type, they do not purchase the entirety of 'the land which is the subject of the [annexation] agreement.' See 65 ILCS 5/11-15.1-4 (West 2002).

Not uncommonly, a unitary tract of land governed by an annexation agreement is later divided and sold to different developers, as happened in this case. The public policy in favor of ensuring the fulfillment of an annexation agreement [citation] would be frustrated if the succession of duties under section 11-15.1-4 continued only as long as the land remained under common ownership." *Id.* ¶ 100.

*Yorkville* acknowledged that the distinction between the two types of purchasers, residential homeowners and developers, is not apparent on the face of section 11-15.1-4. *Id.* ¶ 101.

¶ 50    However, we also easily distinguished the annexation agreement at issue from that in *Doyle*. *Id.* ¶ 99. We noted that the annexation agreement referred to the rights and duties of the " 'DEVELOPER and all successor developers of the PROPERTY or any parcel or phase thereof,' " indicating that the drafters contemplated that the subject property might eventually be owned by more than one developer, whereas the annexation agreement in *Doyle* contained no such provision. (Emphasis omitted.) *Id.*

¶ 51    In considering the precedential value of *Doyle* and *Yorkville*, we begin by agreeing with the Village that *Doyle* presents an irregular and easily distinguishable fact pattern. In *Doyle*, the homeowner illogically sought to stand in the shoes of the developer, as successor, and then sue the developer, *i.e.*, itself. See *Doyle*, 2018 IL App (1st) 170357, ¶ 32 n.3. Substantively, *Doyle*'s absurd-results analysis, adopted by the trial court in the case *sub judice*, reasons one step too far. The *Doyle* court stated that, if it accepted the homeowners' interpretation of the successor liability provision that a subsequent owner of a *portion* of the subject property was a successor, it would lead to the absurd result that each and every homeowner in the subdivision would stand in the developer's shoes and be bound by the developer's obligations. *Id.* ¶ 32. While the *Doyle* court correctly concluded that it would be absurd to equate individual homeowners (who have purchased

already-developed lots for personal residential use) with successor developers (or investors involved in the development process), it does not follow that it would be similarly absurd to confer successor status on a developer who purchases a portion of the subject property.

¶ 52   As this court stated in *Yorkville*: "Not uncommonly, a unitary tract of land governed by an annexation agreement is later divided and sold to different developers, as happened in this case. The public policy in favor of ensuring the fulfillment of an annexation agreement [citation] would be frustrated if the succession of duties under section 11-15.1-4 continued only as long as the land remained under common ownership." *Yorkville*, 2019 IL App (2d) 180230, ¶ 100. Therefore, although the *Yorkville* annexation agreement expressly referred to successors who owned just a portion of the subject property, whereas the Annexation Agreement in our case does not, the public policy concerns expressed in *Yorkville* are equally compelling in the instant case.

¶ 53   The view that proportionate responsibility under an annexation agreement is a common and workable scenario is further supported by this court's opinion in *Elgin*, 2015 IL App (2d) 150013. In that case, the surety guaranteeing the original developer's performance under an annexation agreement filed a counterclaim against a successor developer. *Id.* ¶ 7. In determining that the surety's counterclaim should survive dismissal, the appellate court accepted, for the purposes of the pleading, that the successor developer was bound by the terms of the annexation agreement even though it owned just a portion of the subject property. *Id.* ¶ 21. Moreover, it rejected the successor developer's argument that the surety failed to add as necessary parties the individual homeowners who had purchased their homes from the original developer. *Id.* ¶ 39. First, it found forfeited the new developer's argument that the annexation agreement imposes on those individual homeowners an obligation to complete the improvements set forth therein. *Id.* Forfeiture aside, it noted that the annexation agreement

> "[did] not impose a universal and unlimited obligation to make all improvements anywhere in the development upon anyone who purchased property in the development. Rather, it imposes upon purchasers *the obligations 'of the Developer *** for the parcel sold.'* Thus, the obligations imposed upon any particular purchaser depend upon the obligations of [the original developer] that remain unsatisfied with respect to the specific 'parcel sold.' If these obligations have already been satisfied with respect to the parcel—as would be the case where [the original developer] or some other entity had already completed the improvements at issue with respect to the homes that were sold—the individual purchasing homeowners would not be subject to any liability ***. Accordingly, they would not have an interest requiring protection." (Emphasis added.) *Id.* ¶ 40.

Thus, this court in *Elgin* declined to subscribe to the *Doyle* court's concern that conferring successor status on those who purchase a portion of the subject property such that they will be bound by an annexation agreement would have the unintended consequence of burdening ordinary homeowners with municipal development responsibilities. With our review of *Doyle* and *Yorkville* and, to a lesser degree, *Elgin*, in mind, we turn to the Annexation Agreement.

¶ 54                          B. The Annexation Agreement

¶ 55    We next consider the specific language of the Annexation Agreement, reading the agreement as a whole and with an aim to avoid absurd results. See, *e.g.*, *Gallagher*, 226 Ill. 2d at 233; *Foxfield*, 287 Ill. App. 3d at 523-24. We determine that the Annexation Agreement contemplated that the subject property would be divided and sold, potentially to different developers, who would be proportionally bound by the Annexation Agreement, which was a covenant that ran with the land.

¶ 56    The Annexation Agreement set forth in its introductory terms that the subject property was to be developed and subdivided. *Supra* ¶ 7. The agreement stated, throughout, that the property was to be developed in "stages" or "phases." For example, section 5 provides that "the Subject Property will be developed in *stages*, requiring the submittal of plats and plans for each stage or unit. *** In the event of a *phased* development, then each phase shall be complete and comply fully with all applicable laws." (Emphases added.)

¶ 57    Moreover, as noted by this court in *Yorkville*, this sort of division is amenable to practical application. See *Yorkville*, 2019 IL App (2d) 180230, ¶ 90. For example, section 14 of the Annexation Agreement, addressing the irrevocable letter of credit at issue here, is workable in the event that multiple developers separately owned portions of the subject property. Again, that provision states that the "Landowner would secure an irrevocable letter of credit *** from a financial institution payable to the Village to guarantee the quality construction of all public facilities to be constructed *at any unit or stage of development for which approval is sought*. The letter of credit would be in the amount of 100% of the contract costs of construction in the unit or stage of development or 125% of the Landowner engineer's contract estimate in the unit or stage of development." (Emphasis added.) The Village here sought a letter of credit in an amount specific to the stage of development, for roads only, not for storm drains, etc., and in accordance with KPHC's proportion of ownership.

¶ 58    Also, conferring successor status on the owner of a portion of the subject property here would not, as the *Doyle* court cautioned, result in individual residential homeowners being unduly burdened with municipal development responsibilities. For example, multiple provisions in the Annexation Agreement clarify that there is an end to any owner's obligation to participate in the development of the property. Section 27 provides that the term of the agreement is 20 years. More

critically, sections 7, 9, and 10, covering the improvements for storm drains, well and water supply, and roadways, respectively, each provide that, "upon proper completion of [the same], the Village shall promptly accept such improvements and thereafter maintain such improvements." Section 13, covering the dedication of improvements in general, also provides that the "Village shall promptly accept such improvements upon completion of construction of same and thereafter maintain such improvements." These provisions show that, following the completion and acceptance by the Village of any stage or phase of development, the responsibility for the improvements will lie with the Village and not with any subsequent purchaser, be it a developer who purchases the property mid-development or a residential homeowner who purchases a lot or lots from personal use.

¶ 59     Finally, as to the language of the Annexation Agreement, we note that it does, in at least one instance, more expressly distinguish the landowner and its successors who shoulder the development responsibilities from future individual property owners like the homeowners in *Doyle*. That is, in a portion of section 10, the Annexation Agreement provides that the landowner is *not* required to install streetlights. Instead, each lot is to be equipped with a lamppost within 10 feet of the roadway, and occupancy permits will not be issued without said equipment, at which point the "property owner" of the lot is to maintain the lamppost in accordance with the Village ordinance.

¶ 60     Given these provisions, we do not share the *Doyle* court's concern that, under the Village's interpretation, ordinary homeowners will be burdened with the responsibility of municipal improvements. Rather, it is the adoption of KPHC's interpretation that would lead to an absurd result. As KPHC acknowledges, if the landowner had sold every lot but one to a new developer, in this case 81 of 82 lots, the new developer would not be a "successor" and would not be bound

by the terms of the Annexation Agreement. This outcome would certainly undermine the public policy of ensuring that annexation agreements are adhered to so that municipal development may proceed in an orderly and predictable manner. See, *e.g.*, *Orland Park*, 135 Ill. App. 3d at 526. Moreover, given that the Annexation Agreement contemplated the possibility that the subject property might be subdivided and developed in stages, it would make little sense to interpret the agreement as no longer applying where a successor developer takes on the development of a subsequent stage of the development. Indeed, this is an absurdity that would potentially lead to stalled development, as the successor developer and the Village would have to commence new annexation negotiations.

¶ 61    In sum, we recognize that the Annexation Agreement, which runs with the land, neither expressly provides for nor expressly precludes the application of the terms of the Annexation Agreement when a subsequent owner purchases less than the entire property. However, we determine that its terms clearly contemplate the possibility that the subject property would be subdivided and developed in stages and phases, which is entirely consistent with proportionally burdening successor owners with obligations under the Annexation Agreement. Conversely, of course, the Village's obligations under the Annexation Agreement persist *vis-à-vis* such successor owners. And while Annexation Agreement, incorporated by reference in the KPHC I and KPHC II deeds, continues to obligate KPHC for the reasons expressed above, it of course does not follow that individual homeowners are similarly obligated under the Annexation Agreement. Accordingly, we conclude that the original parties to the Annexation Agreement intended to confer successor status on those who purchase a portion of the subject property during the development phase, a result entirely consistent with the public policy favoring adherence to annexation agreements and the orderly progression of development. The Village has properly pleaded that

KPHC is a successor owner of record bound by the terms of the Annexation Agreement and, as such, its complaint should have survived dismissal.

¶ 62    Given our holding, we need not address the Village's alternative argument concerning contractual assignment, nor need we address its claim that KPHC conceded that it was a successor prior to the filing of the operative complaint. Also, because KPHC is no longer the prevailing party, we vacate the trial court's award of attorney fees to KPHC.

¶ 63                                III. CONCLUSION

¶ 64    For the reasons stated, we reverse the trial court's section 2-615 dismissal, remand for further proceedings consistent with this opinion, and vacate the award of attorney fees.

¶ 65    Reversed in part and vacated in part; cause remanded.

---

**No. 2-20-0780**

---

| | |
|---|---|
| **Cite as:** | *Village of Kirkland v. Kirkland Properties Holdings Co., LLC I*, 2022 IL App (2d) 200780 |

---

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of De Kalb County, No. 19-L-33; the Hon. Bradley J. Waller, Judge, presiding. |

---

| | |
|---|---|
| **Attorneys for Appellant:** | Michael J. Smoron and Jennifer J. Gibson, of Zukowski, Rogers, Flood & McArdle, of Crystal Lake, for appellant. |

---

| | |
|---|---|
| **Attorneys for Appellee:** | Colin W. Anderson and Omar F. Uddin, of Anderson & Uddin, P.C., of Aurora, for appellees. |

---