2026 IL App (1st) 250014-U

FIRST DISTRICT,
SIXTH DIVISION
February 27, 2026

No. 1-25-0014

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

_____

| | | |
|---|---|---|
| SPERRY VAN NESS, LLC, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellant, | ) | Cook County, Illinois. |
| v. | ) | |
| | ) | No. 2023 L 000408 |
| BCL-1946 S. RACINE LLC, | ) | |
| BCL-1645 WEST 17th LLC, and | ) | |
| BCL-3340 CARPENTER LLC, | ) | Honorable |
| | ) | Anthony C. Swanagan, |
| | ) | Judge Presiding. |
| Defendants-Appellees. | ) | |

_____

JUSTICE GAMRATH delivered the judgment of the court.
Justices Pucinski and Hyman concurred in the judgment.

**ORDER**

¶ 1     *Held*:  We affirm summary judgment for defendants because the plaintiff, a real estate broker, is not entitled to commissions under the sales listing agreements.

¶ 2     In this breach of contract case, the plaintiff, real estate broker, failed to sell three properties it was hired to sell but claims it is still entitled to commissions. The circuit court rejected this proposition, as do we.

¶ 3                                    I. BACKGROUND

¶ 4        Between 2019 and early 2020, Barnett Capital Ltd. hired plaintiff Sperry Van Ness, LLC (SVN), a real estate broker, to sell three Chicago properties owned by defendants BCL-1946 S. Racine LLC, BCL-1645 West 17th LLC, and BCL-3340 Carpenter LLC. Barnett was the beneficial owner of all three LLCs. When none of the properties sold, Barnett pulled them from the market and transferred them to three new entities for refinancing.

¶ 5        For each property, SVN signed an "Exclusive Sales Listing Agreement" with the respective defendant LLC. Section 2 of each listing agreement is titled "Commission for Selling the Property" and provides that the LLC will pay SVN a commission if:

"(a) the Property is sold to a purchaser procured by Broker, Owner, or anyone else; (b) a purchaser is procured by Broker, Owner, or anyone else who is ready, willing, and able to purchase the Property ***; (c) any contract for the sale of the Property is entered into by Owner; (d) Owner removes the Property from the market or the Property is transferred due to eminent domain or the threat thereof, foreclosure, or conveyance in lieu of foreclosure; *(e) Owner contributes or conveys the Property to a partnership, joint venture or other business entity*; (f) Owner is a corporation, partnership, or other business entity and an interest in such corporation, partnership or other business entity is transferred *** in lieu of a sale of the Property." (Emphasis added.)

¶ 6        Section 2 further provides that the commission is calculated according to the "Broker's Schedule of Sale and Lease Commissions," which is incorporated into the contract. For the Racine Property, the commission is calculated at 4% of "THE TOTAL PURCHASE PRICE OF THE PROPERTY" if there is no cooperating broker, or 4.5% if there is one. For the other two

properties, the commission is calculated at 6% of "THE TOTAL PURCHASE PRICE OF THE PROPERTY." (Emphasis in original.)

¶ 7        By summer 2020, none of the properties had sold. Around the same time, Chikoo Patel became manager of the properties. Patel recommended that Barnett repair the properties, work to bring their occupancy rates close to 100%, and refinance the existing debt on them. He also offered to secure a loan for the refinancing on Barnett's behalf.

¶ 8        Barnett created three new entities: 1946 South Racine LLC, CKO Pilsen LLC, and 3340 South Carpenter LLC (collectively, the new BCL entities). Each new BCL entity is owned 65% by Barnett's company MFAPT Legacy LLC, 17.5% by Patel's company CKO Holdings LLC, and 17.5% by Ruby Development, a company with an existing relationship with Barnett. On November 30, 2020, Barnett made a capital contribution to the new BCL entities by transferring the properties at their market values.[1] No monies were exchanged and no other member contributed any capital. The parties agreed that if any of the properties were sold in the future, the proceeds would be split as follows: Barnett would first receive 100% of the proceeds up to the amount of its capital contribution (the market value of the property at the time of transfer, as specified in the operating agreement). Any extra proceeds would be divided between Barnett, CKO, and Ruby according to their membership interests: 65%, 17.5%, and 17.5%.

¶ 9        SVN demanded defendants pay a commission based on the transfer of the properties to the new BCL entities, citing section 2(e) of each listing agreement. Defendants refused to pay, and SVN sued for breach of contract. In its complaint, SVN alleged the commissions should be calculated based on the value of the membership interests that defendants received in the new BCL entities. After learning defendants did not receive any membership interest in the new BCL

---

[1] The Racine Property was conveyed to 1946 South Racine LLC, the West 17th Property was conveyed to CKO Pilsen LLC, and the Carpenter Property was conveyed to 3340 South Carpenter LLC.

entities, SVN changed course, arguing its commissions should be calculated based upon the market value of each property, as identified in the operating agreement of each new BCL entity.

¶ 10 Both parties filed motions for summary judgment. The circuit court granted defendants' motion and denied SVN's motion. The court interpreted section 2(e) of the listing agreements "in harmony with its surrounding clauses," and found it "provide[s] a commission to [SVN] if the Properties are conveyed to a corporate entity distinct from the Defendants, in exchange for monetary compensation. That did not happen. The Court finds it implausible that the parties in this case intended to obligate Defendants to pay Plaintiff a commission upon conveying the property to newly formed entities by their own parent company, for purposes of refinancing the properties, the Plaintiff having had nothing to do with that conveyance." SVN appeals.

¶ 11                                   II. ANALYSIS

¶ 12 Summary judgment is proper where the pleadings, affidavits, depositions, admissions, and exhibits on file, when viewed in the light most favorable to the nonmovant, reveal that there is no issue as to any material fact and that the movant is entitled to judgment as a matter of law. See 735 ILCS 5/2–1005(c) (West 2018). We review the circuit court's grant of summary judgment *de novo. Williams v. Manchester*, 228 Ill. 2d 404, 417 (2008). Where, as here, the parties file cross-motions for summary judgment, they agree there are no genuine issues of material fact and ask the court to decide the questions presented as a matter of law based on the record. *Casey's Marketing Co. v. Hamer,* 2016 IL App (1st) 143485, ¶ 11.

¶ 13 The construction of a contract and a determination of the rights and obligations thereunder are questions of law appropriate for summary judgment. *Wolff v. Bethany N. Suburban Group,* 2021 IL App (1st) 191858, ¶ 36. In construing a contract, our objective is to discern and give effect to the parties' intent as set forth in the contract language. *Thompson v.*

*Gordon*, 241 Ill. 2d 428, 441 (2011); *Buenz v. Frontline Transportation Co.*, 227 Ill. 2d 302, 208 (2008). We read the contract as a whole, viewing each provision in light of the others. *Thompson*, 241 Ill. 2d at 441. When the language is unambiguous, we will enforce it as written without considering extrinsic aids and will not rewrite a contract to give a party a better bargain than they contracted for. *Chandra v. Chandra*, 2016 IL App (1st) 143858, ¶ 17.

¶ 14    Here, SVN argues it is owed commissions per section 2(e) of the listing agreements, which requires a commission if: "Owner contributes or conveys the Property to a partnership, joint venture or other business entity." However, contract intent must be evaluated as a whole, not by isolated clauses. *Thompson*, 241 Ill. 2d at 441. Reading the listing agreements as a whole, the parties only intended commissions to be paid if a property was conveyed to a distinct business entity in exchange for payment or monetary value, which did not occur in this case. Each contract is titled "Exclusive *Sales* Listing Agreement," and section 2 is captioned "Commission for *Selling* the Property." (Emphasis added.) See *Kennedy, Ryan, Monigal & Assocs., Inc. v. Watkins*, 242 Ill. App. 3d 289, 296 (1993) (the caption of an instrument should be considered along with all other language of the agreement in determining the parties' intent). The agreements state that the commission is calculated as a percentage of "THE TOTAL PURCHASE PRICE OF THE PROPERTY" (emphasis in original) and assume the property will be sold or transferred to another party in exchange for payment or something of value.

¶ 15    For instance, sections 2(a) through 2(c) expressly involve the property being sold. Section 2(d) describes the property being taken by eminent domain, for which the government would have to provide "just compensation" (U.S. Const. amend. V), or foreclosure, which would lead to a judicial sale of the property. Section 2(f) covers cases where a defendant LLC transfers a membership interest in the LLC instead of selling the property itself. Reading section 2(e) in

harmony with these other subsections, it is absurd to interpret the listing agreements as requiring commission payments when Barnett transferred properties to LLCs it controls without any sale or exchange for value. See *Village of Kirkland v. Kirkland Properties Holdings Co., LLC I*, 2022 IL App (2d) 200780, ¶ 28 (courts construe contract language to avoid absurd results).

¶ 16        *Foxfield Realty, Inc. v. Kubala*, 287 Ill. App. 3d 519 (1997), is instructive. In *Foxfield*, a couple hired a real estate broker to sell their property, agreeing to pay a 6% commission "if any sale or exchange is made by [the] BROKER, by the SELLER or by anyone else" during the listing period. *Id.* at 521. Subsequently, the couple divorced. Pursuant to a marital settlement agreement, the wife quitclaimed her interest in the house to the husband in exchange for other property and an allocation of debt. *Id.* at 521-22. We held the broker was not entitled to a commission, finding it "inconceivable" that the couple reasonably contemplated they would have to pay a commission for a partial transfer of the property between themselves. *Id.* at 525. We further stated: "No reasonable person would enter into a sales contract in which he subjected himself to an unnecessary and unearned commission for the sale of property to himself or to his spouse under the circumstances presented." *Id.*

¶ 17        Likewise, in this case, the properties were not sold to an external buyer for valuable consideration. Instead, they were transferred to new entities controlled by Barnett to facilitate refinancing. Barnett kept all its interest in their market value at the time of the transfers, and as the circuit court observed: "No money changed hands. The properties remained under the same control before and after the transfer."

¶ 18        SVN contends that *Foxfield* is different because the properties here were transferred to LLCs "with different managers, members, capital accounts, and control rights," making them "substantive conveyances." We disagree. Each new BCL entity is owned 65% by Barnett, 17.5%

by CKO, and 17.5% by Ruby. In future sales of the properties, CKO and Ruby will not share in the initial proceeds. Barnett will receive 100% of the proceeds up to its capital contribution (the market value of the property at the time of transfer, as specified in the operating agreement). Any surplus is split according to ownership percentages. As in *Foxfield,* it is "inconceivable" that defendants intended to pay SVN commissions while Barnett retained its interest in the full market value of the properties as if there were no external entities involved.

¶ 19    SVN's citation to the 79-year-old case of *Scham v. Besse*, 397 Ill. 309, 316 (1947), is unavailing. That fact services may constitute consideration for a contract does not transform the transactions here into a contribution or conveyance within the meaning of the listing agreements where no money exchanged hands and no purchase price is involved. Because Barnett retained its entire interest in the properties' market values, SVN is not entitled to commissions.

¶ 20    Even if SVN were owed anything, commissions are based on "THE TOTAL PURCHASE PRICE OF THE PROPERTY." The purchase price was zero, as defendants received no monetary value for the transfers. Recognizing this, SVN argues for commissions based on the market value of each property, as identified in the operating agreement of each new BCL entity. However, this method of calculation is not specified in the listing agreements, and we will not rewrite the contracts to give SVN a better bargain than it contracted for. See *Chandra*, 2016 IL App (1st) 143858, ¶ 17.

¶ 21                            III. CONCLUSION

¶ 22    For the foregoing reasons, we affirm the judgment of the circuit court.

¶ 23    Affirmed.